**AUDIOVISUAL PUBLISHERS, INC., Plaintiff,**

v.

**CENCO INCORPORATED, Defendant.**

No. 72 Civ. 1681(WCC).

United States District Court, S.D. New York.

May 22, 1997.

*OPINION AND ORDER*

WILLIAM C. CONNER, Senior District Judge.

This case is before the court on defendant's motion to vacate the findings of an audit that examines the royalty certification statement defendant submitted pursuant to the parties' 1975 Consent Judgment. The auditor, William Shulman, has concluded that Plaintiff Audiovisual Publishers ("AVP") is entitled to approximately $6.7 million in royalty payments and accrued interest from Defendant Cenco, Inc. ("Cenco"). Defendant contends that the assumptions and methodology that Mr. Shulman employed are flawed and that his conclusions should be rejected. In defendant's view, it owes no money to plaintiff. Not surprisingly, plaintiff argues that Mr. Shulman's audit was proper and asks the court to direct defendant to pay the amount Mr. Shulman determined to be due plaintiff.

## I. BACKGROUND

The convoluted history of the instant litigation, which spans almost a quarter century, is set forth in the court's prior opinions. However, in order to place the most recent iteration of this long-running dispute in context, a brief review of past events is warranted. AVP, a producer of educational film strips and cassettes, initiated this breach of contract action against Cenco in 1972, claiming that Cenco had deprived it of royalties for certain cassettes under an arrangement between the parties.

The action was settled by a consent judgment on July 10, 1975 ("Consent Judgment"), pursuant to which Cenco agreed, *inter alia,* to pay AVP a royalty on each tape previously made and to be made in the future from AVP's scripted master tapes. The Consent Judgment calls for Cenco to provide an initial multi-year royalty report and regular periodic reports thereafter. It gives AVP the express right to request an audit of Cenco's books and records to confirm the accuracy of Cenco's royalty reports with regard to (1) the number of cassettes and other tapes purchased and acquired by Cenco upon which royalties are due, and (2) the amount due

Sullivan & Cromwell, New York City, for Plaintiff; D. Stuart Meiklejohn, Michael E. Swartz, Of Counsel.

Weil, Gotshal & Manges, New York City, for Defendant; Stephen A. Radin, Mary Lou Peters, Of Counsel.

based on the difference between the weighted average price charged by AVP for production of tapes and the weighted average price charged by Deryck Waring ("DW"), from whom defendant also obtained cassettes, for production services. The Consent Judgment also entitles AVP to compensation for new filmstrips prepared by defendant that duplicate more than twenty-five percent of the frames of a previously-existing filmstrip for which AVP scripted the audio master. This court retained jurisdiction over the matter to ensure compliance with the Consent Judgment.

Defendant submitted its royalty certification statement for the period August 1, 1971 through June 30, 1975, and plaintiff objected. However, the parties discovered that many of defendant's relevant records were missing. Because plaintiff was subsequently unable to locate an auditor willing and able to review defendant's royalty statement, the court directed defendant to obtain an audit. In April 1984, Arthur Andersen & Co. ("Arthur Andersen") completed an audit of defendant's royalty statement. Consistent with the court's directive, Arthur Andersen limited its review to the period from August 1, 1971 to April 30, 1973. Arthur Andersen confirmed the royalty statement's accuracy subject to two significant qualifications.[1] On December 10, 1986, Magistrate Judge Gershon rejected AVP's challenges to the audit and approved Arthur Andersen's finding that plaintiff was entitled to additional royalties in the amount of $200.[2] This court adopted the magistrate's findings, and the Court of Appeals for the Second Circuit denied plaintiff's subsequent appeal.

After the proceedings related to the Arthur Andersen audit concluded, AVP exercised its right under the Consent Judgment to an audit of defendant's royalty certification statements for the years 1973 to 1975, which were outside the scope of Arthur Andersen's examination. In 1991, AVP nominated the firm of Shulman & Solomon to perform this audit, and defendant eventually consented to plaintiff's choice of auditor. Mr. Shulman then conducted the audit in two parts. In a December 1994 report, Mr. Shulman concluded that defendant owed AVP $3,449,928.44 in royalties and interest pursuant to the Consent Judgment's cassette royalty and filmstrip provisions. In a separate report, Mr. Shulman also found that defendant owed plaintiff $538,453.27 including interest under the Consent Judgment's "Deryck Waring" provisions.

In response to defendant's objections to the December reports, Mr. Shulman first modified his original reports and then issued a revised report in July 1995 ("Revised Report"). The Revised Report reduced plaintiff's recommended award by $184,049.91 before interest to correct for several accounting errors. However, Mr. Shulman also made substantive alterations to his report that resulted in a net increase of $532,012 before interest.[3]

## II. DISCUSSION

Defendant, in several lengthy submissions to the court, forcefully, albeit repetitively, raises numerous challenges to the Shulman audit. Defendant urges first that the audit suffers from methodological defects that render the entire audit invalid. Second, defendant contends that, aside from the audit's

---

1. First, for purposes of its audit, Arthur Andersen accepted the validity of a master list of royalty cassettes supplied by defendant. Arthur Andersen did not resolve plaintiff's claim that defendant should have included additional cassettes on that list. Second, Arthur Andersen noted that for some purchases by defendant during the audit period, no invoices were available from which it could be determined whether those purchases were of royalty cassettes.

2. Magistrate Judge Gershon concluded that in light of plaintiff's failure to proffer any evidence that defendant's list of royalty cassettes was in

error, no basis existed to modify that list. Order dated Dec. 10, 1986, at 13–14. Magistrate Judge Gershon further concluded that the absence of certain invoices did not warrant the inference that all of the purchases related to those invoices were royalty purchases. *Id.* at 8.

3. In his Revised Report, Mr. Shulman withdrew his earlier Deryck Waring audit report. Mr. Shulman reasoned that plaintiff was entitled to payment under the Consent Decree's royalty provisions for those masters that he had initially treated under the Deryck Waring provisions.

systemic flaws, Mr. Shulman's substantive conclusions are incorrect.

### A.  Mr. Shulman's Methodology

[1]  Defendant argues that Mr. Shulman's conclusions deserve no weight because Mr. Shulman did not perform his audit in accordance with Generally Accepted Auditing Standards ("GAAS").  Although the Consent Judgment is silent as to the type of audit required, defendant argues that an audit is an "attest service" that must be conducted pursuant to GAAS or the Statements of Standards for Attestation Engagements.  In support of this position, defendant observes that Magistrate Judge Gershon, after denying plaintiff's request for a conference to consider the specific auditing methods and procedures to be followed by Arthur Andersen, expressly directed Arthur Andersen to "conduct the audit under the generally accepted standards and procedures of its profession."  Order dated Jan. 27, 1984, at 3. Similarly, Magistrate Judge Sinclair found that "[g]enerally accepted auditing standards ... apply to special purpose audits such as royalty reviews."  Order dated July 23, 1981, at 18.

Defendant maintains that plaintiff indicated prior to the audit that Mr. Shulman would adhere to GAAS and that on the basis of plaintiff's representations defendant assented to plaintiff's nomination of Mr. Shulman. Last, defendant argues that in 1986 plaintiff challenged the Arthur Andersen audit on the ground that it deviated from GAAS. Therefore, in defendant's view, it is disingenuous for plaintiff now to claim that Mr. Shulman need not have adhered to GAAS in conducting his audit.

We are unpersuaded by defendant's argument that Mr. Shulman erred by not adhering to GAAS.[4] The Consent Judgment does not expressly require the application of GAAS testing standards.  Moreover, we agree with plaintiff that the absence of a substantial number of relevant records in this case justifies resort to reasonable alternative methods of accounting.  As we previously observed with respect to the Arthur Andersen audit, "it is clear that a patchwork of alternative procedures will be required in any attempt to apply generally accepted auditing standards....  [T]he need for alternative methods of testing the royalty statements for 1971 and 1972 is occasioned by the state of defendant's documentations."  Opinion dated Feb. 23, 1983, at 10.

We note that, contrary to defendant's assertion, plaintiff did not misrepresent to either the court or defendant that Mr. Shulman would conduct a strict GAAS audit. Rather, in the 1991 letter to the court upon which defendant relies, Maxime Ferris, AVP's owner, stated, "I imagine that all other auditing matters could and should be left to the discretion of the accounting firm conducting the audit....  I would imagine that the accountant who undertakes this or any other audit would want to do his work as he sees fit within the guidelines of GAAS ..." Letter from Ferris to the court dated Apr. 15, 1991, at 2. Mr. Ferris' statements cannot reasonably be read as an assurance that the audit now at issue would be conducted in strict conformity to GAAS. To the contrary, Mr. Ferris' statements are clearly an expression of his view that the auditor would be afforded significant latitude in conducting his

---

4.  We agree with defendant that whatever presumptive correctness Mr. Shulman's report may have does not shift the ultimate burden of proof in this matter from plaintiff to defendant.  However, with respect to accounting issues, the report constitutes a prima facie showing that defendant's royalty statement was in error as to royalties due for the period from May 1, 1973 to June 30, 1975 and at least shifts to defendant the burden of going forward.

We reject plaintiff's contention that Mr. Shulman functioned as an arbitrator of the dispute between the parties and that his findings are thus final and binding absent proof of fraud, bad faith, or manifest disregard of the law.  This theory finds no support in either the language of the Consent Judgment or the history of this litigation, which includes AVP's extensive challenge to the Arthur Andersen audit and repeated acknowledgements by the parties that the independent auditor's report would be subject to review. *Clark v. Kraftco*, 510 F.2d 500 (2d Cir.1975), relied upon by plaintiff, is not to the contrary. In contrast to the instant Consent Judgment, the contract at issue in *Clark* expressly stated that "[t]he decisions of the consultants shall be *final and binding.*"  *Id.* at 502 (emphasis added by the court of appeals).  We will treat Mr. Shulman's audit as a report by an accounting expert and accord it the weight that we determine it merits.

examination.[5]

■ Defendant next attacks Mr. Shulman's report on the ground that Mr. Shulman failed to perform his work with due professional care. In support of this claim, defendant offers numerous examples of what defendant and defendant's expert believe are fatal flaws in Mr. Shulman's conduct of the audit. Defendant's principal criticisms are that Mr. Shulman failed to examine the internal control structure in effect at Eye Gate, Cenco's predecessor in interest, during the audit period; that he failed to cite source material supporting the factual assertions in his report; that he did not consider relevant evidence; and that he lacked impartiality.

We find that defendant overstates the importance of a review of internal controls at Eye Gate. Defendant contends that such a review by Mr. Shulman was necessary in order for Mr. Shulman to "develop[ ] an understanding of . . . how various types of books and records (such as invoices, voucher registers, and bank statements) supported and complimented [sic] one another. . . ." Cenco Reply Mem. at 25. Had he conducted this review, according to defendant, Mr. Shulman would have performed his missing-check analysis differently. However, we are satisfied that Mr. Shulman had an understanding of defendant's control structure sufficient to allow him to form judgments about the claims in defendant's royalty statement. If, as defendant contends, Mr. Shulman erred in the conduct of his missing-check analysis, it was not because he failed to review Eye Gate's internal controls. Contrary to defendant's assertion, we see little reason why Mr. Shulman would need to embark on a comprehensive study of Eye Gate's control structure in order for him to understand that checks not written during the audit period did not represent a royalty due during that period. Similarly, it is clear that royalties would be unwarranted for any missing checks that bank records show were nev-

er negotiated. Moreover, we note that plaintiff's experts have concluded that because Eye Gate is no longer a going concern "the lack of financial records, the inability to observe and discuss accounting procedures, and the twenty-year distance between the current examination and the actual recording of the transactions in question definitively moots the need for assessment of the internal control structure at Eye Gate in the early 1970s." Spinelli & Wynne Aff. of Sept. 21, 1995, at 5.

As to Mr. Shulman's alleged failure to cite specific support for his factual assertions, we find Mr. Shulman's response somewhat unsatisfying. Mr. Shulman simply disregards defendant's criticism that the absence of factual support taints his workpapers. However, rather than invalidate the entire audit on this ground, the court will consider Mr. Shulman's challenged conclusions and reject those that lack adequate substantiation. In addition, it is unfortunate that Mr. Shulman apparently declined to consider fully some potentially relevant evidence offered by defendant and may have engaged in substantive ex parte communications with plaintiff while not affording defendant the same opportunity to articulate its position. Although Mr. Shulman's conduct does not warrant setting aside the audit, it somewhat diminishes the weight to which the audit is entitled, as does the fact that Mr. Shulman issued signed but "imperfect" reports in December 1994 apparently with the expectation that he would subsequently revise them. Shulman Aff. at 28–29.

We have considered each of defendant's additional contentions and are not persuaded that Mr. Shulman failed to exercise due professional care. To the contrary, we find that the audit was reasonably thorough in scope and that, generally speaking, the work was competently planned and carried out. Nevertheless, although we are satisfied that, for the most part, Mr. Shulman used permissible and reasonable auditing judgment in the circumstances presented, several of his assump-

---

**5.** Plaintiff's efforts to invalidate the Arthur Andersen audit on the ground that it failed to comply with GAAS are not inconsistent with plaintiff's current position. Unlike Mr. Shulman, Arthur Andersen purported to have adhered to GAAS, and it was thus appropriate for plaintiff to challenge that audit on the basis of

Arthur Andersen's alleged deviation from that standard. Moreover, throughout this litigation, plaintiff has consistently argued that a strict GAAS audit inadequately protects its interests under the Consent Judgment and that alternative accounting procedures are warranted in light of the sorry state of defendant's records.

tio us and findings, discussed below in the context of defendant's specific objections to the audit report, are clearly insupportable.

### B. Mr. Shulman's Substantive Conclusions

Defendant challenges virtually every aspect and detail of Mr. Shulman's audit report. However, defendant's criticisms of the audit fall into four general categories. First, defendant argues that, contrary to Mr. Shulman's analysis, it owes no royalties for non-captioned-filmstrip cassettes produced from the 730 audio masters that Mr. Shulman contends defendant should have designated as royalty-generating audio masters (the "undesignated masters"). Second, defendant asserts that no further royalties are due on cassette purchases stemming from the 637 captioned filmstrips that comprised defendant's original list of royalty-producing audio masters (the "designated masters"). Third, in defendant's view, it owes AVP no payment under the Consent Judgment's filmstrip provisions. Last, defendant states that if any money is due plaintiff, Mr. Shulman's interest calculations are flawed and should be revised.

### 1. Deryck Waring Masters and Previously Undesignated Audio Masters

Paragraph 2 of the Consent Judgment provides for royalty payments on cassette purchases thus:

> Cenco will pay to Audiovisual an amount equal to fifty cents for each cassette or other tape purchased or acquired by it since August 1, 1971, from a supplier other than Audiovisual which used a script created by Audiovisual solely at its own expense.

Defendant maintains, and has maintained from the outset, that AVP scripted and produced 637 original audio masters for captioned filmstrips (those filmstrips originally created without sound but for which defendant subsequently supplied audio narration) and that royalties are due only on cassettes created from these designated masters. These 637 titles comprise the list of royalty masters upon which Arthur Andersen relied in conducting its audit. However, Mr. Shulman has determined that, in addition to the audio masters designated by defendant, there are 730 audio masters corresponding to noncaptioned filmstrips that should be treated as royalty masters.

#### a. Deryck Waring Masters

■ Of the 730 undesignated masters that Mr. Shulman identifies, 243 are Deryck Waring masters within the meaning of the Consent Judgment.[6] Revised Report at 12a. As defendant observes, a Deryck Waring master is, by definition, a master produced by AVP using a script "provided or paid for by Cenco." Consent Judgment at ¶ 6. Thus, a master cannot be both a Deryck Waring master under Paragraph 6 and a royalty master scripted solely by AVP under Paragraph 2 of the Consent Judgment. Mr. Shulman's unilateral determination that in 1975 a representative of defendant made misstatements to the court and that as a consequence the Consent Judgment must be modified to eliminate the Deryck Waring provisions is wholly inappropriate and is rejected. Revised Report at 20. Mr. Shulman does not have the discretionary authority to fundamentally alter the terms of the Consent Judgment by treating Deryck Waring masters as royalty masters.[7]

#### b. Undesignated Masters

■ We next consider the 487 previously undesignated audio masters that Mr. Shul-

---

**6.** Paragraph 6 of the Consent Judgment states:

Cenco shall ... pay to Audiovisual the difference between the weighted average amount charged by Audiovisual to Cenco for original master tapes produced by Audiovisual using scripts provided or paid for by Cenco and the weighted average amount charged for original master tapes produced by Deryck Waring for Cenco during the period from 1965 through the date on which Audiovisual produced its final original master tape using a transcript produced or paid for by Cenco.

Paragraph 8 provides that if the DW weighted average exceeds the AVP weighted average, Eye Gate must pay an amount equal to the difference multiplied by the number of masters produced by AVP.

**7.** Any recovery to which plaintiff is entitled for Deryck Waring masters must be based on the Consent Judgment's Deryck Waring provisions. In this regard, we note the parties' dispute as to whether the Deryck Waring provisions require a comparison of the weighted average of the

man has determined fall within the scope of the Consent Judgment's royalty provision. Mr. Shulman reasons that 373 of these masters are appropriately treated as royalty-generating masters because there is evidence, in the form of invoices and purchase orders, establishing that AVP produced them. Based on the assumption that AVP produced these masters,[8] Mr. Shulman concludes that AVP most likely created the final scripts for these masters at its own expense and is therefore entitled to royalties. Mr. Shulman also obtained AVP scripts for 106 "folktale" audio masters and identified eight additional masters from a series that appeared in an Eye Gate catalogue during the relevant period. Mr. Shulman thus deems these 114 masters to be royalty masters.

Several earlier decisions in this case squarely addressed the issue of which audio masters are to be included on the list of royalty titles. In her 1986 Order, Magistrate Judge Gershon found that the master list submitted by defendant was accurate. Magistrate Judge Gershon stated:

The question is whether further proceedings should be instituted to determine if there are royalty cassette titles other than those on defendant's master list.

. . . . [T]he dispute over the completeness of defendant's list of royalty cassettes arose years ago. In March 1980, defendant advised plaintiff that the cassettes plaintiff sought to add to the list were

excluded by defendant either because they were produced with sound prior to the time plaintiff started working with Eye Gate or because the sound was provided by a party other than plaintiff. Plaintiff was requested to submit proof as to its claim that the additional cassettes should be included. Nonetheless, to this day, plaintiff has failed to offer any basis, evidentiary or otherwise, to support its position. It attacks the auditors for relying on the representations of defendant's employees, but fails to offer any basis for concluding that its own list is correct.

This failure defeats plaintiff's claim. Eye Gate's sales catalogs are fully available. Plaintiff has not disputed defendant's statement that "plaintiff's own records should demonstrate whether it produced a master tape that matches up with any of the cassette titles sold by Eye Gate." Despite the volume of plaintiff's papers on this motion, plaintiff fails to offer any basis, evidentiary or otherwise, for concluding that defendant is in error. . . . .

[T]his is not a situation where only the defendant is in possession of the necessary facts. As to determining the master list, plaintiff is in a position to proffer evidence from its own records refuting defendant's position, if such evidence exists. It has failed to do so.

Order dated Dec. 10, 1986 at 13–14.

Plaintiff challenged Magistrate Gershon's determinations, including her resolution of

---

amounts actually charged to defendant by Deryck Waring and AVP, as defendant contends, or whether the comparison should reflect the cost of "similar services," as plaintiff and Mr. Shulman now maintain.

The language of the Consent Judgment is clear and unambiguous, and there is nothing therein to support plaintiff's position. This court's observation, relied upon by plaintiff, that the Deryck Waring provision was "added to the settlement agreement because of Audiovisual's firmly-held belief that Cenco cheated it by paying more to Mr. Waring for similar services" clearly refers to the production of original master tapes generally and does not justify Mr. Shulman's elaborate effort to calculate how much Deryck Waring would have charged had it provided exactly the same services as AVP. Opinion and Order dated July 6, 1983, at 4. Plaintiff has raised this issue on several prior occasions, and Magistrate Judge

Sinclair and this court have rejected plaintiff's arguments. See Findings and Conclusions dated July 23, 1981, at 23–24; AVP Br. dated Jan. 31, 1983 at 2–3; AVP Br. dated May 27, 1983, at 30–31; Opinion and Order dated July 6, 1983, at 4–5.

8. Although defendant at one point took the position that "Mr. Ferris did nothing more for Eye Gate than prepare audio for captioned filmstrips which had originally been manufactured without sound," Letter from Radin to Shulman dated Oct. 10, 1991, at 6, attached to Radin Aff. as Exh. 64, defendant subsequently acknowledged "that AVP 'produced' masters having code numbers matching those on Mr. Ferris' undesignated master list." Letter from Radin to Shulman dated July 31, 1994 at 3, attached to Radin Aff. as Exh. 135. However, as reflected in defendant's July 31 letter and as discussed below, plaintiff now disputes the meaning of "produced."

the master-list issue, but this court declined to vacate her findings. Opinion and Order dated Sept. 14, 1988. Plaintiff subsequently sought relief from the court of appeals and was rebuffed. Order dated Feb. 22, 1989. In its brief on appeal, plaintiff specifically attacked the propriety of the master list used by Arthur Andersen in its audit. AVP Br. dated Nov. 21, 1988, at 7–8.

We recognize that Mr. Shulman's audit covers a period not addressed by the previous Arthur Andersen audit and that Mr. Shulman is not bound to apply the same methodology or adopt the same assumptions as did Arthur Andersen. In September 1994, we granted Mr. Shulman's request that he be permitted to compute royalties for cassettes reproduced from undesignated masters. However, we reserved final decision on the factual issues related to this matter. One such issue is whether Mr. Shulman's analysis and conclusions as to the undesignated masters are inconsistent with prior judicial rulings. After careful consideration, we find that Magistrate Judge Gershon specifically addressed and rejected plaintiff's claim that it is entitled to royalties from masters other than those that appeared on defendant's list of designated royalty masters. Moreover, plaintiff received a full and fair opportunity to present to Magistrate Judge Gershon the evidence upon which it now relies, but it did not do so. We therefore decline to disturb the magistrate's ruling by adopting plaintiff's and Mr. Shulman's theory as to the undesignated masters; to do so would be contrary to the law of the case.

■ More importantly, Mr. Shulman's key assumption that all audio masters produced by AVP were necessarily scripted by AVP is unreasonable. In October 1994, we stated that "[i]t seems natural to assume that AVP produced the scripts for such masters unless Manor Care [defendant's successor in interest] can prove otherwise." Letter Ruling dated Oct. 7, 1994. However, defendant has proffered evidence sufficient to rebut the presumption at issue.

Defendant submitted to Mr. Shulman the affidavits of four individuals who aver that writers other than AVP authored scripts used in more than thirty of the contested masters. Cadden Aff. at ¶ 3; Nelson Aff. at ¶¶ 3, 4; Rydell Aff. at ¶¶ 4, 5; Wesner Aff. at ¶¶ 3, 4. In addition, defendant pointed out that titles corresponding to at least fifty audio masters appeared in Eye Gate's 1965 catalogue. Thus, according to defendant, AVP could not have provided scripts for these masters because AVP did not begin its collaboration with defendant until 1966. Last, defendant offered Mr. Shulman scripts and other documents that it contends establish that an additional ninety-one masters were not scripted by AVP.

Mr. Shulman disregarded the affidavits because in his view the affiants were not credible. Shulman Aff. at 25. He rejected defendant's claims regarding the titles listed in the 1965 catalogue because he concluded that it was "impossible to confirm that these [masters] were not rewritten" by AVP, as Mr. Ferris now contends. Shulman Aff. at 59. Mr. Shulman initially refused to examine the scripts and other documents that defendant discovered because defendant did not deliver them to his office by the court-established deadline of October 31, 1994, Shulman Aff. at 22–25, although they were available at the offices of counsel for defendant in New York on that date. Mr. Shulman subsequently declined to accept defendant's offer to send the original documents to him if he would assume responsibility for their safekeeping but apparently did examine copies of some of the documents. Mr. Shulman now maintains that the evidence offered by defendant has little probative value unless an examination of the relevant cassettes establishes that the scripts in defendant's possession were in fact the final ones used to create the master tapes. According to Mr. Shulman: "anything short of original scripts (plus the correlated cassettes, in this case) is totally unacceptable. . . ." Shulman Aff. at 16.

We have examined copies of the affidavits, the 1965 catalogue, and several of the scripts at issue. In our view, they suggest that, with regard to numerous undesignated masters, AVP did not furnish the final scripts. Defendant's submissions are sufficient to rebut Mr. Shulman's largely unsubstantiated assumption that because AVP may have produced

the undesignated masters, AVP must have also scripted those masters.[9] Mr. Shulman's decision to reject the third-party affidavits and the catalogue evidence without further inquiry was unjustified. Moreover, we see no reason why the onus of providing the cassettes that corresponded to the scripts at issue should necessarily have fallen upon defendant. Apparently, it was not until July 1995 that Mr. Shulman issued his demand that he receive these cassettes. Therefore, defendant can hardly be faulted for not obtaining the cassettes at an earlier time.

We note plaintiff's contention that defendant's evidence "establishes nothing because Eye Gate produced descriptive explanation scripts, provided the guidance necessary for AVP to draft final scripts for non-captioned filmstrips, and AVP always provided Cenco with the final scripts used by the narrator when it sent 'listening' copies of the masters to Cenco to check for errors." AVP Mem. dated Sept. 21, 1995, at 53. Although defendant's possession of the final scripts, in itself, is not dispositive, the fact that two of the scripts examined by the court bear the name of an author not employed by AVP militates in favor of the conclusion that AVP did not create the final version of those scripts. Cenco Exh. 234 at C60, C68. Regardless of the meaning attached to "solely" in Paragraph 2 of the Consent Judgment, which the parties dispute, if AVP did not create the final script, AVP is not entitled to royalties. Mr. Ferris' recent assertion that many of the scripts at issue appear to be "descriptive explanation" scripts from which AVP created the final scripts is unsupported and unpersuasive. *See* Ferris Aff. dated Sept. 21, 1995, at ¶¶ 13–15. There is no indication that those who defendant asserts authored the final scripts actually wrote only descriptive explanations or storylines which AVP subse-

quently transformed into final scripts. As defendant points out, the lone "descriptive explanation" script adduced by plaintiff in support of his contention seems to be a series of illustration descriptions for the "What to look for in Poetry" series. Exh. 2, attached to Ferris Aff. dated Sept. 21, 1995. In offering this evidence, Mr. Ferris fails to note that a page preceding the "descriptive explanation" appears to credit Mr. Frederick Madeo as the author, Cenco Exh. 233, at C495, attached to Radin Aff. dated Nov. 14, 1995, and that a lengthy narrative script follows the pages to which Mr. Ferris alludes. Cenco Exh. 233, at C571–77. We see no reason to conclude that someone other than Mr. Madeo wrote the final script for the this filmstrip.

As to the 106 folktale masters and the seven additional masters from the Code No. 8–1 series,[10] we also find Mr. Shulman's conclusions to be unwarranted. Defendant asserts that Eye Gate's sales catalogues demonstrate that Eye Gate never sold cassettes and filmstrips corresponding to the folktale masters. In response, Mr. Shulman states, "AVP is entitled to compensation for any masters it produced for Cenco wherein it provided the final scripts whether or not copies reproduced from the masters had yet been advertised in an Eye Gate catalogue." Shulman Reply Aff. at ¶ 17. However, contrary to Mr. Shulman's apparent understanding, AVP is not due compensation for all masters it scripted and produced. Rather, plaintiff is entitled to royalties on cassettes "acquired by defendant from a supplier other than Audiovisual which used a script created by Audiovisual solely at its own expense." Consent Judgment at ¶ 2.

The fact that filmstrips based on the folktale scripts discovered by plaintiff were nev-

---

9. Mr. Shulman and plaintiff contend that, because defendant was entitled to obtain scripts from plaintiff pursuant to their 1966 contract at no additional cost, it would have been fiscally irrational for defendant to pay a third party to create final scripts. This analysis has superficial appeal. However, the parties clearly provided in the 1966 contract that defendant could choose not to submit final scripts to AVP. The fact that, in retrospect, defendant's reasons for exercising that option are difficult to discern is an insufficient basis upon which to reject defendant's evi-

dence. Moreover, we note defendant's contentions that the 1966 contract applied only to reel-to-reel tapes rather than cassettes and that AVP's script-writing was so inadequate that defendant undertook to obtain scripts from other sources.

10. In his reply affidavit, Mr. Shulman acknowledges that seven rather than eight masters comprise the series for which he determined that royalties are due. Shulman Reply Aff. at ¶ 25.

er marketed in an Eye Gate catalogue, while not dispositive, suggests that defendant did not acquire any cassettes related to the folktale masters. Had defendant received these cassettes from a supplier, defendant would logically have listed them for sale in its catalogues. Neither Mr. Shulman nor plaintiff disputes defendant's factual claim that the folktale filmstrips did not appear in the catalogues, and neither Mr. Shulman nor plaintiff adequately refutes the conclusion that reasonably follows from their absence in those catalogues.

As with the folktale masters, Mr. Shulman erred in treating the seven Code No. 8–1 masters as royalty masters. Apparently, Mr. Shulman based his determination on AVP's claim that it scripted these masters and on the fact that they were part of a series that Eye Gate included in its catalogues. Revised Report at 12a. We fail to see how, without some corroboration of AVP's claim to authorship of the scripts, the fact that a filmstrip series appeared in an Eye Gate catalogue establishes that AVP scripted the related audio masters.[11]

In sum, the proof presented fails to demonstrate that it is more likely than not that AVP created the final scripts for all of the undesignated masters, as Mr. Shulman chose to assume. Although the possibility exists that AVP may have scripted some of the masters at issue, the passage of so many years makes it unreasonable to require that defendant produce evidence of the authorship of every master at issue. As noted above, plaintiff bears the ultimate burden of persuasion with regard to its claim that defendant has failed to comply with the Consent Judgment by understating the amount of royalties due. Defendant's submissions controvert AVP's assertion that AVP scripted all of the masters it may have produced. Absent additional evidence supporting plaintiff's claims, there is an insufficient basis to infer that plaintiff scripted all or even some of the

undesignated masters. For the foregoing reasons, Mr. Shulman's opinion that plaintiff is entitled to payment for cassettes produced from the undesignated audio masters is rejected.

In addition, Mr. Shulman erred in concluding that plaintiff should be compensated for the sale of phonographic records produced from masters scripted by AVP. Paragraph 2 of the Consent Judgment unambiguously provides that plaintiff is entitled to royalties "for each cassette or other type of tape purchased or acquired by [defendant]." Had the parties contemplated that plaintiff was to receive royalties on phonographic records that reproduced audio masters, the parties would surely have so indicated in the Consent Judgment, as they did in their 1966 contract. Try as it might, plaintiff cannot persuade us that a twelve-inch, vinyl record is a "cassette or other type of tape" within the meaning of the Consent Judgment.

c. Undesignated Masters as Deryck Waring Masters

█ Plaintiff argues that if it is not entitled to royalties for the undesignated audio masters under Paragraph 2 of the Consent Judgment, plaintiff must be entitled to payment under the Consent Judgment's Deryck Waring provision. According to plaintiff, the purchase orders and invoices it has provided establish that plaintiff produced the masters and, assuming *arguendo* that plaintiff did not create the final scripts, as defendant now contends, the masters would fall within the scope of Paragraph 6 of the Consent Judgment. Defendant counters that the documents upon which plaintiff relies demonstrate at most that plaintiff duplicated "production copy" masters and not that it produced "original" masters as the DW provision requires. Defendant observes that the purchase orders and invoices relied upon by plaintiff refer only to the duplication of cassettes, records, and tapes and make no

11. Plaintiff's claim that it is entitled to compensation for an additional 290 audio masters that plaintiff did not identify until after Mr. Shulman issued his revised report in July 1995 is rejected. Not only is plaintiff's assertion untimely but it appears to be based on the fact that codes corresponding to masters that plaintiff contends it

produced appeared in Eye Gate's catalogues without any prefixes. Ferris Aff. dated Sept. 21, 1995, at ¶¶ 22–27 (stating that the absence of a prefix demonstrates that AVP "did all the audio work"). We are not satisfied that the presence of these codes in Eye Gate's catalogues is sufficient to establish that AVP created the final scripts.

reference to services associated with the production of masters. By contrast, according to defendant, the invoices for those masters previously identified as DW masters clearly reflect charges for production, as opposed to duplication services. Defendant maintains that "AVP only bulk duplicated the undesignated masters into cassettes, records and tapes *after* they were produced (and scripted) by other suppliers." Cenco Reply Mem. at 54.

Plaintiff urges that we should reject defendant's argument because defendant's current position that AVP performed only duplicating services, but not mastering services, is inconsistent with defendant's prior statement that "[i]t cannot be emphasized enough that Mr. Ferris did nothing more for Eye Gate than prepare audio for captioned filmstrips which had originally been manufactured without sound." Letter from Radin to Shulman, dated Oct. 10, 1991, at 6. Plaintiff argues that given defendant's contradictory statements, defendant's present claim is not credible. Moreover, according to plaintiff, defendant's failure to offer any documentation establishing that an entity other than AVP produced the masters at issue justifies the inference that AVP in fact produced them. Last, plaintiff asserts that the procedure in effect during the period in question did not require plaintiff to generate production invoices when it created audio masters for defendant. According to plaintiff, it created the invoices for the 243 DW masters in order to reflect "discounted labor and other charges that Eye Gate agreed to pay AVP to induce it to produce the 243 masters that were the subject of the Deryck Waring audit." AVP Surreply Mem. at 4–5.

In September 1993, I stated, "Although I frankly have serious doubts whether AVP is entitled to any additional royalties on account of the Deryck Waring and filmstrip-comparison provisions of the settlement agreement, I have permitted an audit broad enough to cover any such potential liability ..." Letter Ruling dated Sept. 7, 1993. Mr. Shulman completed an audit of the defendant's certification statement regarding the 243 audio masters designated by defendant as DW masters. Mr. Shulman subsequently withdrew this audit. Given that no auditor has conducted a comprehensive examination of the documents relevant to whether all of the undesignated masters should be treated as DW masters and given that virtually every facet of plaintiff's role in the production process is now in dispute, this court finds that there is an inadequate basis to resolve this matter at the present time. However, we reiterate our conclusion, stated above, that the unambiguous terms of the Consent Judgment call for a comparison of the weighted average amounts actually charged by AVP and DW. As Magistrate Judge Sinclair observed in rejecting a variation of the similar-services theory for calculating DW payments that plaintiff now proposes:

> This argument is baseless. It ignores the plain focus of the settlement agreement on charges for tapes, not for line-items on invoices.... It is obvious that the "weighted average" was intended to mean the invoice charges for tape production extended by the number of tapes.... Thus there is no basis for plaintiff's dispute concerning the weighted average provisions ...

Order dated July 23, 1981, at 24.

2. *Previously Designated Audio Masters*

The parties agree that plaintiff is entitled to royalties on cassette purchases related to the 637 audio masters that defendant designated in its 1975 royalty certification statement. Pursuant to that statement, which covered the period August 1, 1971 through June 30, 1975, defendant paid plaintiff a total of $130,073. $68,579.50 of that total constituted royalties for the May 1, 1973 to June 30, 1975 period, which Mr. Shulman examined in his audit. In his July 1995 royalty report, Mr. Shulman concluded that defendant owed plaintiff an additional $47,865 in royalties and $307,987 as a supplement for defendant's numerous missing checks.

In the course of conducting his review, Mr. Shulman examined defendant's voucher register of transactions with cassette suppliers for the relevant period. In order to determine the quantity and code number of the cassettes in each transaction, Mr. Shulman also sought to review the purchase invoices

and packing slips corresponding to each voucher-register entry. However, Mr. Shulman discovered that "there were only approximately 14% of the entries from the voucher register that were supported by supplier invoices. Therefore, any attempt to provide the parties with a true invoice by invoice audit was impossible." Revised Report at 10. Thus, Mr. Shulman was forced to devise an alternative method of ascertaining the royalties due.

Mr. Shulman first calculated, based on an examination of defendant's voucher-register entries, that from 1973 to 1975 defendant paid $201,493.82 to suppliers for cassettes and that 197,543 of those cassettes were royalty-generating cassettes.[12] Mr. Shulman then added this figure to the 112,987 royalty cassettes Arthur Andersen found that plaintiff had purchased. Mr. Shulman concluded that plaintiff was entitled to royalties on a total of 310,530 cassettes. He then reasoned that the difference between this figure and the 260,146 cassettes that defendant listed in its royalty statement represented the number of cassettes upon which defendant still owes royalties. Mr. Shulman calculated that almost all of the 50,384 cassettes at issue were double sided and thus contained recordings of two masters. To account for this, Mr. Shulman multiplied 50,384 by 1.9 and concluded that the proper number of royalty units was 95,729. Last, Mr. Shulman multiplied 95,729 by the royalty rate of $0.50 per cassette and arrived at $47,865 as the royalty due on these masters.

Mr. Shulman also estimated that of the 906 missing checks relevant to the period covered by defendant's royalty statement, one-third or 302 checks were for defendant's cassette purchases.[13] Based on an average check amount of $1,094.97, which Mr. Shulman cal-

culated from relevant existing checks for cassette purchases, and an average cassette price of $0.51, Mr. Shulman concluded that the missing checks accounted for 648,394 cassettes. As in his regular royalty audit, Mr. Shulman then reduced his estimate of the total number of cassettes on the assumption that only half of those cassettes (324,197) were related to royalty masters. Multiplying by 1.9 to account for double-sided cassettes and then multiplying by $0.50 pursuant the Consent Judgment's royalty provision, Mr. Shulman assessed an additional $307,987 before interest against defendant.

Defendant challenges Mr. Shulman's audit on several grounds. First, defendant argues that Mr. Shulman's analysis is contrary to prior judicial rulings in this matter. Second, in defendant's view, the average cassette price of $0.51 that Mr. Shulman applied in his calculations is too low. Thus, the total number of royalty cassettes (634,727) is inflated and is inconsistent with the 1500–unit, sales-life figure that Mr. Shulman assumed with regard to the undesignated masters. Third, according to defendant, Mr. Shulman should only have assessed royalties, if at all, based on the number of cassettes containing copies of masters and not on the number of masters reproduced on those cassettes. Fourth, defendant maintains that Mr. Shulman's missing-check audit unfairly assessed royalties on cassettes that he already accounted for in his regular audit. Last, defendant argues that Mr. Shulman failed to examine relevant records and that had he done so he would have discovered that defendant issued many of the missing checks outside the audit period.

a. Prior Related Findings

[8] We reject defendant's contention that the earlier findings of Magistrate Judges

12. Mr. Shulman divided $201,493.82 by $0.51, which he calculated to be the average price defendant paid for the cassettes, to arrive at the total number of cassettes defendant purchased. He then reduced that figure (395,086) to 197,543 on the theory that half of the cassettes were created from royalty masters. Mr. Shulman does not elaborate on his basis for concluding that half of the total number of cassettes were royalty cassettes except to state that all of his assumptions were conservative and necessitated by the lack of numerous relevant records.

13. In explaining his assumption that one-third of the missing checks pertained to cassette purchases, Mr. Shulman states: "We felt that many checks were probably written to individual persons ... as well as for payroll and the multitude of overhead items ... that were typical of a merchandising company like Cenco. We also felt that allowing 2/3 of the checks for other than cassette purchases was an extremely conservative approach." Revised Report at 6.

Sinclair and Gershon preclude Mr. Shulman's attempt to assess royalties based on missing invoices and checks. In her review of the Arthur Andersen audit, Magistrate Judge Gershon concluded that it would be inappropriate to require that defendant shoulder the burden of identifying the contents of each of the numerous missing invoices. To avoid providing plaintiff with a windfall based on the unavailability of records, the magistrate refused plaintiff's request that all purchases unaccounted for in existing invoices be treated as royalty purchases. Order dated Dec. 10, 1986, at 11. Mr. Shulman's approach is not at odds with Magistrate Judge Gershon's ruling. Mr. Shulman does not draw the type of sweeping adverse inference that plaintiff earlier sought from Magistrate Judge Gershon to account for missing documents. Rather than treat every missing check and invoice as royalty related, Mr. Shulman attempted to formulate a reasonable basis to compensate plaintiff for royalties that it did not receive because of defendant's failure to preserve relevant documents. Although it would be improper to draw a blanket adverse inference against defendant for failing to safeguard these documents, it would be equally inequitable to allow defendant to immunize itself by invoking the absence of records as a bar against plaintiff's claims for compensation.

However, Magistrate Judge Sinclair, responding to plaintiff's allegations of impropriety on defendant's part, unequivocally concluded that "[a]bsolutely no evidence has been adduced to suggest that the loss of ... records was intentional or otherwise culpable." Order dated July 23, 1981, at 21. Mr. Shulman's speculation to the contrary is of no force or effect. Mr. Shulman's role in this matter was to conduct an audit of defendant's royalty statements for the 1973–1975 period and to determine, on the basis of the available evidence, the extent of any errors therein. It is inappropriate for Mr. Shulman to compensate plaintiff for what he suspects may have been the fraudulent destruction of records by defendant.

### b.  Average Cassette Price

[9]  The parties dispute Eye Gate's average purchase price for captioned filmstrip cassettes. Mr. Shulman calculated that price to be $0.51 based "primarily" on his assessment of available invoices from Associated Audio Services ("Associated"), one of defendant's cassette suppliers. Revised Report at 10. Defendant argues that Mr. Shulman should have relied upon invoices from RKO, another supplier, which establish the average royalty cassette price to be $0.86.[14] According to defendant, all of the Associated invoices are for noncaptioned-filmstrip cassettes, and there is no evidence that Associated provided captioned cassettes to defendant during the audit period. Thus, defendant contends, the available RKO invoices, all of which are for captioned-filmstrip cassettes, are a better indicator of the relevant average price.

In our view, it was reasonable for Mr. Shulman to consider the Associated invoices in calculating the average price of royalty cassettes. Defendant's surviving records establish that Associated supplied a significant number of cassettes, albeit nonroyalty cassettes, to defendant during the audit period. Moreover, the fact that in 1980, defendant purchased royalty cassettes from Associated lends support to Mr. Shulman's assumption that Associated also did so during the period in question. However, we find that Mr. Shulman erred in refusing to include the RKO data in his computations. Mr. Shulman's reasoning in this regard is opaque. He offers no persuasive support for his contention that "the bulk of the 86% of missing

---

14.  Had Mr. Shulman used a higher average cassette price in his calculations, he would obviously have arrived at the conclusion that defendant received fewer than the 634,727 royalty cassettes reflected in his Revised Report. As further support for its claim that Mr. Shulman's estimate of 634,727 is unreasonably high, defendant points out that Mr. Shulman's estimate far exceeds the 344,385 cassettes that defendant's calculation employing the 1500–cassette, sales-life assumption suggests is appropriate. In fact, according to defendant, it has already paid plaintiff significantly more than the $172,192.50 it would owe under this approach. Cenco Reply Mem. at 59. We think this fact alone calls into question the validity of the 1500–cassette, sales-life assumption, which, in any event, is only applicable to Mr. Shulman's analysis of noncaptioned-filmstrip masters.

invoices were those of Associated." Shulman Aff. dated Dec. 15, 1995, at 6. Mr. Shulman maintains that "[he] can only be concerned with missing invoices, not existing ones." *Id.* Yet, as defendant observes, Mr. Shulman relied principally on existing Associated invoices to calculate the average cassette price. We discern no reasoned basis to exclude the RKO invoices, which are at least as relevant as those from Associated. Rather than clouding the issue, as Mr. Shulman claims, defendant's proposed $0.58 average price,[15] based on both sets of invoices, provides a reasonable estimate of the weighted average cassette price.[16]

#### c. The 1.9 Multiplier

■ Defendant also attacks Mr. Shulman's decision to award plaintiff royalties for every master reproduced on the cassettes at issue rather than for each cassette. In defendant's view, the fact that many of the royalty cassettes contained recordings of two masters is irrelevant because the Consent Judgment unambiguously provides that royalties are to be assessed at a rate of "fifty cents for each cassette or other type of tape." Consent Judgment at ¶ 2. Plaintiff responds that the parties' intent upon entering into the Consent Judgment was to compensate plaintiff for reproduction of its audio masters and that royalties should therefore "be propor-

tionate to the number of masters reproduced." AVP Mem. at 48.

■ A consent judgment or decree is "an agreement of the parties entered into upon the record with the sanction and approval of the [c]ourt." *Schurr v. Austin Galleries of Ill., Inc.*, 719 F.2d 571, 574 (2d Cir.1983) (quoting *Town of Oyster Bay v. Forte*, 34 Misc.2d 5, 219 N.Y.S.2d 456, 459 (N.Y.Sup. Ct.1961)). A consent judgment is a contract to end a lawsuit in which the parties agree to the relief to be provided by the judgment and the wording to effectuate that relief. *Interspace Inc. v. Morris*, 650 F.Supp. 107, 109 (S.D.N.Y.1986). It is presumed that parties enter into a consent judgment only after careful negotiation has produced agreement on its terms. *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971).

Because a consent judgment typically embodies a compromise between adversaries, the consent judgment itself cannot be said to have a purpose. Rather, according to the Court, "the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *Id.* at 681–82, 91 S.Ct. at 1757. Accordingly, for purposes of enforcement, a consent judgment or decree should be construed and interpreted as a contract. *Schurr*, 719 F.2d at 574.

---

15. Mr. Shulman does not appear to dispute that defendant's calculation of average cassette price using both sets of invoices is accurate. *See* Shulman Reply Aff. at 6.

16. In assailing Mr. Shulman's conclusions, defendant challenges an alternative theory offered by Mr. Shulman to support his opinion that defendant acquired a total of 634,727 captioned filmstrips, rather than 260,146 as defendant contends, during the period from 1971 to 1975. Based on the deposition testimony of Robert F. Newman, Eye Gate's former president, Mr. Shulman assumed that defendant purchased 10,000 cassettes per week over the approximately 200–week duration of the royalty period. Relying on this assumption and treating half of the cassettes as royalty cassettes, Mr. Shulman reasoned that plaintiff would be entitled to compensation for one million cassettes. Therefore, in Mr. Shulman's view, his estimate of 634,727 cassettes is conservative and reasonable.

Mr. Newman's statement that "[w]e kept pleading with [Mr. Ferris] to give us a schedule of delivery. We had been sending purchase orders, the purchase orders totalled some 30,000 cassettes, and we had been getting maybe 1500 cassettes a week ... I think [Mr. Ferris] agreed that he would deliver 6,000 cassettes a week" does not clearly confirm that plaintiff provided defendant with 6,000 cassettes per week indefinitely. Newman Dep. dated June 16, 1975, at 61. Both Mr. Newman's comments and Cenco's statement that in 1971 "it was mutually agreed that Audiovisual would sell and deliver to Cenco within 10 days 20,400 specified cassettes," Cenco Amended Answer and Counterclaim dated Dec. 2, 1974, at ¶ 3, appear to address temporary measures required to dissipate backlogs in plaintiff's delivery of cassettes to defendant. Moreover, Mr. Shulman's assumption that the 6000–per–week volume increased to an average of 10,000 per week during the entire 1971–1975 period is thinly supported at best. We find Mr. Shulman's analysis in this regard overly speculative and thus of little value.

The scope of a consent judgment "must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Armour & Co.,* 402 U.S. at 681–82, 91 S.Ct. at 1757. If the language utilized has only one reasonable interpretation, then the court must read the decree in accordance with its "plain meaning" or "explicit language." *Berger v. Heckler,* 771 F.2d 1556 (2d Cir.1985). If, however, the wording is susceptible to more than one reasonable construction, then the court will look to extrinsic evidence, as is the case with ambiguous contracts. *United States v. American Soc'y of Composers, Authors and Publishers,* 782 F.Supp. 778, 788 (S.D.N.Y. 1991), *aff'd,* 956 F.2d 21 (2d Cir.1992), *cert. denied,* 504 U.S. 914, 112 S.Ct. 1950, 118 L.Ed.2d 554 (1992). "[R]eliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent judgment, any technical meaning words used may have had to the parties, and other documents expressly incorporated in the decree." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). Further, the Supreme Court has ruled that terms in a consent decree may be interpreted in light of "the circumstances surrounding the formation of the consent order." [17] *ITT Continental Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935; *see United States v. American Cyanamid Co.,* 719 F.2d 558, 564 (2d Cir.1983) (stating that "when the language of a consent decree provision is not clear on its face, a court of equity may, in construing the provision, consider the purpose of the provision in the overall context of the judgment at the time the judgment was entered"), *cert. de-*

*nied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984). This reference to extrinsic evidence in *ITT* encompasses not only traditional parol evidence but also any meaningful indicia of the purpose of the contested provision. *American Soc'y of Composers, Authors and Publishers,* 782 F.Supp. at 788.

Paragraph 2 of the Consent Judgment is clear and unambiguous: defendant is to pay plaintiff "fifty cents for each cassette or other type of tape." Neither plaintiff nor Mr. Shulman has presented a convincing argument that Paragraph 2 is susceptible to more than one interpretation or that it is a misstatement of the parties' shared intentions regarding the payment of royalties. Rather, Mr. Shulman relies on tenuous extrinsic evidence in an effort to controvert the plain meaning of that provision. As support for his decision to award royalties on the basis of masters recorded, Mr. Shulman cites the fact that in 1965, AVP sold defendant reels of tape containing only one master. In his view, this establishes that in 1975 the parties must have intended that "one master only would be used to reproduce a cassette, with the same subject reproduced on both sides." Shulman Aff. at 61. Mr. Shulman concludes that because defendant departed from this understanding by marketing cassettes which reproduced more than one master, he is justified in assessing additional royalties.

The evidence upon which Mr. Shulman relies is far from persuasive, and his conclusion as to the parties' intentions is belied by defendant's submissions.[18] Eye Gate's 1971 catalogue indicates Eye Gate's practice of packaging two complete recordings on one double-sided cassette. 1971 Eye Gate Catalogue at 1, attached to Radin Reply Aff. as Exh. 231. Similarly, Eye Gate's 1973 cata-

---

17. Even if the words of the decree permit only one reasonable interpretation, extrinsic evidence may be appropriate if it is unclear whether the unambiguous provision applies to the set of facts presented in the case. *American Soc'y of Composers, Authors & Publishers,* 782 F.Supp. at 788 n. 5.

18. AVP cites a statement by Mr. McCune, defendant's expert, as support for the contention that both parties understood that defendant would pay royalties for the number of masters reproduced rather than for the number of cassettes on which the masters were copied. AVP also offers

testimony by Mr. Ferris that it was customary in the industry for cassette producers not to place two different recordings on double-sided cassettes. We do not find Mr. McCune's statement that "to determine how many cassettes correlate to each unit or audio master, Mr. Shulman should have divided by two in the case of code numbers having an even number of filmstrips and masters ...." to be relevant. Likewise, we do not find Mr. Ferris' self-serving statements regarding industry practice sufficient to warrant a departure from the clear language of the Consent Judgment.

logue states: "One cassette serves two film-strips—two sides." 1973 Eye Gate Catalogue, inside cover, attached to Radin Aff. as Exh. 184. Moreover, AVP's June 1975 deposition of Robert F. Newman, Eye Gate's former president, suggests that plaintiff's attorney was aware of the royalty implications associated with Eye Gate's practice of marketing cassettes that contained recordings on two sides. Newman Deposition of June 16, 1975, at 102, attached to Shulman Reply Aff. as Exh. 6. Based on the foregoing, we decline to adopt Mr. Shulman's reading of Paragraph 2, which substantially modifies the plain meaning of that provision to suit plaintiff's interests. Applying Mr. Shulman's formula as modified to reflect a $0.58 average cassette price but without multiplying by 1.9, the amount to which plaintiff is entitled pursuant to Mr. Shulman's regular royalty audit is $13,271.50.[19]

### d. The Missing Check Audit

■ Mr. Shulman now accepts defendant's claim that it has located twenty-three checks that Mr. Shulman treated as missing in his Revised Report. Shulman Aff. at 75. In addition, Mr. Shulman does not appear to dispute that an additional ninety-six of the missing checks at issue were never drawn upon. Last, Mr. Shulman seems to agree with defendant that it drafted 360 of the 906 missing checks prior to the beginning of the period subject to Mr. Shulman's audit. Shulman Aff. at 74–75. Mr. Schulman improperly concluded that "royalties for those missing checks falling within Mr. McCune's audit period of August 1, 1971 through April 30, 1973 are justified, because of Mr. McCune's failure to implement an alternative method that would deal with the large number of missing vendor invoices." Schulman Aff. at 74–75. Mr. Shulman's mandate, as he acknowledges,

was to examine the period from May 1, 1973 to June 30, 1975. Revised Report at ¶ 17. Mr. Shulman's recomputation of royalties based on missing checks that were issued during the period covered by the Arthur Andersen audit exceeded his authority and is a nullity. The royalty amount for that period has been exhaustively and decisively litigated and is not open to reconsideration.

■ Of the remaining 427 checks, defendant has identified 121 checks for which it claims that the payee and amount of purchase can be deduced through reference to check numbers, Eye Gate bank statements, voucher registers, check registers, and invoices. According to defendant, Mr. Shulman should not have included these checks in his missing-check assessment. Unfortunately, neither plaintiff nor Mr. Shulman squarely addresses these substantive assertions. Instead, Mr. Shulman responds by alleging that defendant's expert lacks impartiality and that the expert's findings are therefore inherently unreliable. Mr. Shulman also argues: "Many of the assumptions are invalid or rely on inadequate back up supporting documentation. Either a check is missing or it is not missing. Coming up with amounts and assuming they represent missing checks without the evidence of a hard copy of a check is inadequate." Shulman Aff. at 76. We cannot agree with Mr. Shulman's demand that he be presented with a "hard copy" if, as defendant contends, the payee and amount of the missing checks can be reliably identified through recourse to voucher registers, bank statements, and the remaining check disbursement books. Moreover, Mr. Shulman has identified no specific flaws in defendant's analysis that would warrant rejecting defendant's conclusions.

Defendant's conclusions with respect to the 121 missing checks appear to be reasonable,

**19.** We arrive at $13,271.50 based on the following: the total dollar amount of the available checks that defendant issued for cassettes is $201,493.82. This sum divided by the adjusted average price of $0.58 per cassette yields a total of 347,403.13 cassettes. Under Mr. Shulman's model, half of these cassettes, or 173,702, are royalty cassettes. Mr. Shulman has examined the relevant documents including the available checks and invoices, and we accept his assessment that approximately fifty percent of the cas-

settes that defendant received were royalty cassettes. 173,702 added to 112,987 (the number of cassettes Arthur Andersen determined that defendant received during the 1971–1973 audit period) provides the total number of royalty cassettes, 286,689, for the entire period covered by defendant's first royalty statement. 260,146 (the number of royalty cassettes that defendant reported in its royalty statement) subtracted from 286,689 yields 26,543. At a royalty rate of $0.50 per cassette, plaintiff is entitled to $13,271.50.

and Mr. Shulman's conclusory responses do little to convince us otherwise. Shulman Aff. at 78. Absent any persuasive argument to the contrary, we accept defendant's claim that the number of missing checks should be further reduced by 121.[20] However, in the interest of reaching a final resolution of this matter, we find it appropriate that Mr. Shulman included in his missing-check audit the 221 checks that defendant contends were written after June 30, 1975. Regardless of when defendant issued these checks, if they represent payments for royalty cassettes, which defendant does not now dispute, plaintiff is entitled to royalties. Thus, we find that the total number of missing checks is 306. Applying Mr. Shulman's formula, as modified to reflect a $0.58 average cassette price, but without multiplying by 1.9 for the reasons discussed above, we calculate the amount owed on the cassettes covered by the missing checks to be $48,141.[21]

### e. Double Counting

Defendant contends that "[t]he missing check calculation performed by Mr. Shul-

man on top of the royalty audit forces Manor Care to pay royalties twice for the same royalty cassettes: once, by determining the royalties based upon available documentation and projections, and a second time using the missing check listing. This is double counting." Cenco Reply Mem. at 65. We disagree. Mr. Shulman found, and defendant does not dispute, that more than eighty percent of the relevant invoices are missing, as are a significant number of potentially relevant checks and all of the cash disbursement books for transactions prior to February 1976. Findings and Conclusions of Magistrate Judge Sinclair dated July 23, 1981, at 9–10. Given the limited universe of relevant documents, Mr. Shulman's recourse to alternative methods of assessing the number of royalty cassettes that defendant received was reasonable. Arthur Andersen's decision with respect to its audit of the 1971–1973 period not to follow a similar course is irrelevant and not binding upon Mr. Shulman.

In his regular royalty audit, Mr. Shulman tallied the amounts of all of the

20. We reject defendant's assertion that the number of missing checks should be reduced by an additional 53 checks. Defendant has been unable to provide the check numbers of any of these 53 checks, although defendant claims to have identified them through bank statements and the voucher register. We therefore find that defendant's claims as to these 53 checks are speculative and that the evidence is insufficient to justify further reducing the number of missing checks.

We also reject defendant's contentions that Mr. Shulman erred in his determinations of the percentage of missing Eye Gate checks that relate to cassette purchases and the percentage of cassettes received by Eye Gate that were royalty cassettes. The calculations relied upon by defendant in support of these claims are insufficient to persuade us that Mr. Shulman, who had full access to defendant's records and was in a position to evaluate the available checks and invoices, unreasonably concluded that one third of the missing checks were for cassette purchases or that half of the cassettes purchased by defendant were royalty cassettes.

According to defendant, 4.3%, rather than 33.3%, of the missing checks related to cassette purchases from royalty cassette vendors. This claim is based upon a simple calculation of defendant's payments to royalty cassette vendors as a percentage of defendant's total payments to all vendors. Here, however, we are concerned with the number of checks issued by defendant for

royalty cassettes and not with the aggregate sum of those checks. Defendant has not established that its conclusion regarding the amount of the checks for cassette purchases is representative of the number of checks defendant issued for those cassettes.

We are similarly unpersuaded by defendant's assertion that 41%, rather than 50%, of defendant's cassette purchases were of royalty cassettes. In reaching its conclusion, defendant relies upon voucher register entries for transactions with RKO Sound Systems, which defendant asserts was the only supplier of royalty cassettes. However, the reliability of defendant's voucher register is in question and cannot be corroborated given the absence of many relevant documents. Further, the amount that defendant paid to RKO as a percentage of the total that defendant paid to all cassette suppliers is of limited relevance because defendant has not established the price per cassette charged by each of the suppliers.

21. Our missing-check calculation is as follows: one-third of the remaining 306 missing checks is 102. This figure multiplied by 1,094.97 provides the total dollar amount of the missing checks, $111,686.94. $111,686.94 divided by $0.58 yields 192,564, the total number of cassettes that defendant received. Assuming, as does Mr. Shulman, that half of these cassettes are royalty cassettes (96,282) for which plaintiff is entitled to a royalty of $0.50 each, plaintiff is due $48,141.00.

voucher-register entries reflecting defendant's purchases of cassettes during the relevant period. Based on this sum, Mr. Shulman followed the steps described above and concluded that defendant owed plaintiff royalties in the amount of $47,865 for 50,-384 previously uncounted cassettes. By contrast, through his missing-check analysis, Mr. Shulman sought to quantify the number of cassettes that defendant purchased with checks that are no longer available and apparently were not recorded by check number in the voucher register.[22] Mr. Shulman concluded that plaintiff was entitled to royalties for an additional 324,-197 cassettes. Mr. Shulman's two approaches are not clearly duplicative and, in the aggregate, represent Mr. Shulman's opinion of the total number of cassettes for which additional royalties would have been due had all of defendant's documents been available. As discussed above, defendant argues that it has identified many of the missing checks through reference to the extant records. Having accepted most of defendant's claims in this regard, we find that any risk of double counting inherent in Mr. Shulman's approach is minimal.

3. The Filmstrip Comparison

Paragraph 11 of the Consent Judgment provides:

If Cenco shall have a new filmstrip prepared covering the same subject matter as a filmstrip for which Audiovisual furnished an original master tape using a script created by Audiovisual solely at its own expense and such new filmstrip shall incorporate frames duplicating more than 25% of the frames in such original filmstrip, Cenco shall pay to Audiovisual an amount equal to fifty cents for each cassette or tape purchased by Cenco for sale in connection with such filmstrip.

22. We note that defendant's voucher register does not account for every check that defendant issued during the relevant period. Moreover, defendant has not demonstrated that its missing checks can be identified simply by locating the missing check numbers and corresponding transactions in the voucher register.

In his Revised Report, Mr. Shulman concluded that pursuant to the filmstrip provision, plaintiff is entitled to royalty payments for eighteen new filmstrips. Mr. Shulman was unable to make an actual comparison between these filmstrips and the discontinued originals because the latter are no longer available. However, based on an examination of Eye Gate's catalogues, Mr. Shulman determined that the missing filmstrips addressed the same subject matter as the new filmstrips. Mr. Shulman concluded that "[i]t is highly possible that all the new filmstrips which contained the same subject matter as the missing discontinued filmstrips also contained at least 25% of the pictures of the missing discontinued filmstrips." Revised Report at 4.

Defendant argues that Mr. Shulman's filmstrip comparison is invalid because: (1) Magistrate Judge Gershon, this court, and the court of appeals previously considered plaintiff's claims regarding the filmstrips now at issue and found that the Consent Judgment does not entitle plaintiff to a filmstrip-comparison audit; and (2) Mr. Shulman's assumption that the new filmstrips contain more than twenty-five percent of the frames from the discontinued filmstrips is unreasonable.

The earlier decisions in this matter addressed plaintiff's claim that Arthur Andersen erred by not conducting a comprehensive, frame-by-frame examination of all defendant's filmstrips. Magistrate Judge Gershon found that the evidence plaintiff had presented did not warrant the "elaborate verification procedure [plaintiff] seeks." Order dated Dec. 10, 1986, at 12. However, contrary to defendant's assertion, Magistrate Judge Gershon did not expressly rule that plaintiff had no right to any type of filmstrip-comparison audit or that the specific filmstrips currently at issue were not within the scope of Paragraph 11 of the Consent Decree.[23]

23. In its 1988 submission to the court of appeals, plaintiff cited a discontinued filmstrip that addressed the topic of South America and a new filmstrip on the same subject as evidence that Arthur Andersen should have conducted a complete filmstrip comparison. AVP Br. dated Nov. 21, 1988, at 16, attached to Radin Aff. as Exh. 40. The court of appeals rejected plaintiff's ar-

Mr. Shulman has now identified eighteen new filmstrips for which he contends payments are due under Paragraph 11. Mr. Shulman's conclusion rests on defendant's inability to provide discontinued filmstrips that Mr. Shulman identified as covering the same subject as the new filmstrips. Mr. Shulman reasons that because the new filmstrips address the same subject matter as the unavailable filmstrips, it is "highly possible" that they contain at least twenty-five percent of the frames from the discontinued filmstrips.

Mr. Shulman's conclusion is flawed. First, the mere fact that both the new and discontinued filmstrips have titles related to South America can hardly be said to establish, in anything more than the most general sense, that these filmstrips share the same subject matter. Moreover, Mr. Shulman offers no support for his conclusion that an overlap in the general subject matter of the filmstrips in question establishes that the new filmstrips incorporate more than twenty-five percent of the frames from the discontinued filmstrips. Although Mr. Shulman requested and received numerous filmstrips from defendant that he suspected might fall within Paragraph 11's ambit, he has unearthed not a single pair of filmstrips in which the newer filmstrip incorporated more than twenty-five percent of the frames from the older filmstrip. In fact, it appears that Mr. Shulman has not endeavored to test the validity of his assumption at all. *See* Shulman Aff. at 89–90. Thus, we reject Mr. Shulman's conclusions as to the filmstrip comparison.

### 4. Interest

Defendant argues that if plaintiff is found to be entitled to additional royalty payments for the audit period under review, this court should deny interest on the amount that is due. In defendant's view, plaintiff's dilatory

tactics are to blame for the tortured history of this litigation. According to defendant, plaintiff should not now recoup interest for the lengthy periods of delay precipitated by plaintiff's frivolous actions in this matter. In addition, defendant asserts that because Paragraph 2 of the Consent Judgment provides that payment of royalties for the audit period is due "15 days after the report of the auditors giving the audited figure," Mr. Shulman erred by finding that interest began to accumulate as of 1974. According to defendant, interest did not begin to accrue until fifteen days after Mr. Shulman issued his report.

Although the parties dispute the amount of interest that is due, they both appear to agree that any such award should take the form of prejudgment interest, which would reimburse plaintiff for the loss of the use of the funds from the time of the loss to the time of the judgment.[24] Defendant, however, presses the claim that this court should exercise its discretion under federal law to deny interest for the specific years of delay that plaintiff caused through its actions. In this regard, defendant notes that both this court and the court of appeals have remarked upon the frivolous nature of one of plaintiff's past motions in this case.

Defendant urges us to reject plaintiff's assertions that state law controls the issue of prejudgment interest in this diversity action. Defendant argues that federal law is controlling because "[a]n alleged breach of a Consent Judgment by a federal court is a federal claim, governed by federal law." Cenco Reply Mem. at 74 (citation omitted). In support of this assertion, defendant cites the Second Circuit in *Kern v. Hettinger*, 303 F.2d 333, 340 (2d Cir.1962) (citation omitted):

gument but did not rule on whether any specific filmstrips fell within the Consent Judgment's scope. Opinion of the Court of Appeals dated Feb. 22, 1989.

24. We note that Mr. Shulman applied the federal postjudgment interest rate to the royalties he found that defendant owed in this matter. The federal postjudgment statute, 28 U.S.C. § 1961, applies only to "money judgments" that are "recovered" in a district court. Thus, courts have

held that section 1961 is intended to allow postjudgment interest on money awarded by a judge or jury after litigation. *Kincade v. General Tire and Rubber Co.*, 540 F.Supp. 115, 120–21 (W.D.Tx.1982), *rev'd on other grounds*, 716 F.2d 319 (5th Cir.1983). Mandatory postjudgment interest under Section 1961 is not applicable here because the Consent Judgment does not constitute an award of money by the court after litigation of a lawsuit.

One of the strongest policies a court can have is that of determining the scope of its own judgments. It would be destructive of the basic principles of the Federal Rules of Civil Procedure to say that the effect of a judgment of a federal court was governed by the law of the state where the court sits simply because the source of federal jurisdiction is diversity.

In *Kern*, the court held that, in accordance with Fed.R.Civ.P. 41(b), a dismissal for lack of prosecution in a federal diversity action would bar a subsequent diversity action on the same claim, even though the state whose law applied to the second diversity action would not consider the earlier dismissal preclusive. Neither the court's holding in Kern, nor the principles underlying that holding bear on the case at bar. The court's jurisdiction to enter the Consent Judgment and the continued authority to adjudicate the rights of the parties derive directly from the court's initial exercise of diversity jurisdiction over the dispute. *See Lasky v. Continental Products Corp.*, 804 F.2d 250, 254 (3d Cir.1986).

■ We agree with plaintiff that state law governs the availability of prejudgment interest in this diversity action, *see Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir.1993), and that under New York law, prejudgment interest "shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y.C.P.L.R. § 5001(a) (McKinney 1992). Here, we find that Mr. Shulman's conclusions as modified and adopted by the court establish that plaintiff, through its July 1975 royalty statement, undercompensated defendant and thereby breached the terms of the Consent Judgment. Plaintiff is therefore entitled to prejudgment interest at the rate established by New York law.[25]

■ Moreover, equitable considerations support our conclusion that plaintiff should receive prejudgment interest. We decline defendant's invitation to engage in a year-by-year allocation of the responsibility for protracting this litigation. Although plaintiff's conduct contributed to some extent to the delay in resolving this matter, defendant's failure to preserve numerous highly relevant records is the underlying reason that this case is still before the court. Defendant has had the use of plaintiff's money for more than twenty years. It would deprive plaintiff of full compensation and frustrate the Consent Judgment's basic purpose if plaintiff were not awarded interest for the period during which it was denied its royalties.

■ In calculating the amount due plaintiff, Mr. Shulman assessed interest from January 1974, a date which Mr. Shulman contends "more or less averages out the time period between August 1, 1971 and July 31, 1975." Revised Report at 28. However, we reject Mr. Shulman's and plaintiff's view that prejudgment interest is due for the approximately seventeen months that preceded the date of the Consent Judgment. The theory upon which plaintiff seeks prejudgment interest under New York law is that defendant breached the Consent Judgment by understating the royalties it owed plaintiff pursuant to that agreement. The earliest point at which defendant can be said to have failed to comply with the Consent Judgment was July 1975, when defendant submitted its royalty statement and royalties became due to plaintiff. The fact that royalties are payable under Paragraph 3 of the Consent Judgment within fifteen days after the auditor's report does not alter our conclusion that the royalties for the audit period were initially due in July 1975 and that interest began to accrue from that point.[26]

25. Mr. Shulman's proposal to levy an additional assessment against defendant to compensate for "currency deterioration" is unsupported by reference to any case law and is rejected. If accepted, this award would constitute an improper windfall for plaintiff. *See McCoy v. Goldberg*, 810 F.Supp. 539, 544–45 (S.D.N.Y.1993) (stating that the "interest rates under which plaintiff's ... award is calculated include a component to account for inflation; to include a additional inflation factor would be duplicative").

26. As discussed above, Mr. Shulman does not dispute defendant's contention that defendant drafted 221 of the missing checks after the end of the audit period. It would therefore be inappropriate to assess interest as of July 1975 on the royalties attributable to those checks. However, defendant's expert has indicated that defendant drafted the checks not later than December 31, 1976. McCune Aff. at ¶¶ 101, 116. Thus, as a reasonable compromise, interest should be as-

### III. Conclusion

In summary, the conclusions contained in Mr. Shulman's July 1995 Revised Report are modified as follows: plaintiff is entitled to no royalties for the 730 disputed, noncaptioned titles; plaintiff is awarded $13,271.50 plus interest from July 31, 1975 based upon Mr. Shulman's assessment of royalties due for cassettes produced from designated masters; plaintiff is also awarded $48,141.00 plus interest from December 31, 1975 as a supplement for missing checks. Plaintiff is directed to submit to the court a proposed judgment in such amounts plus interest thereon pursuant to New York's prejudgment interest statute.

SO ORDERED.

sessed from December 31, 1975, on the missing-    check royalties.