141 F.3d 405
 157 L.R.R.M. (BNA) 2833
 UNITED STATES of America, Plaintiff-Appellee,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO; The
Commission of La Cosa Nostra; Anthony Salerno, also known
as Fat Tony; Matthew Ianniello, also known as Matty the
Horse; Anthony Provenzano, also known as Tony Pro; Nunzio
Provenzano, also known as Nunzi Pro; Anthony Corallo, also
know as Tony Ducks; Salvatore Santoro, also known as Tom
Mix; Christopher Furnari, Sr., also known as Christie Tick;
Frank Mazno; Carmine Persico, also known as Snake, also
known as Junior, also known as The Snake; Gennaro Langella,
also known as Gerry Lang; Philip Rastelli, also known as
Rusty; Nicholas Marangello, also known as Nicky Glasses;
Joseph Massino, also known as Joey Messina; Anthony
Ficarotta, also known as Figgy; Eugene Boffa, Sr.; Francis
Sheeran; Milton Rockman, also known as Maishe; John
Tronolone, also known as Peanuts; Joseph John Aiuppa, also
known as Joey O'Brien, also known as Joe Doves, also known
as Joey Aiuppa; John Phillip Cerone, also known as Jackie
the Lackie, also known as Jackie Cerone; Joseph Lombardo,
also known as Joey the Clown; Angelo Lapietra, also known
as The Nutcracker; Frank Balistrieri, also known as Mr. B;
Carl Angelo Deluna, also known as Toughy; Carl Civella,
also known as Corky; Anthony Thomas Civella, also known as
Tony Ripe; General Executive Board, International
Brotherhood OF Teamsters, Chauffeurs, Warehousemen and
Helpers of America; Jackie Presser, General President;
Weldon Mathis, General Secretary-Treasurer; Joseph
Treroltola, also known as Joe T., First Vice President;
Robert Holmes, Sr., Second Vice President; William J.
McCarthy, Third Vice President; Joseph W. Morgan, Fourth
Vice President; Edward M. Lawson, Fifth Vice President;
Arnold Weinmeister, Sixth Vice President; John H.
Cleveland, Seventh Vice President; Maurice R. Schurr,
Eighth Vice President; Donald Peters, Ninth Vice President;
Walter J. Shea, Tenth Vice President; Harold Friedman,
Eleventh Vice President; Jack D. Cox, Twelfth Vice
President; Don L. West, Thirteenth Vice President; Michael
J. Riley, Fourteenth Vice President; Theodore Cozza,
Fifteenth Vice President; Daniel Ligurotis, Sixteenth Vice
President; and Salvatore Provenzano, also known as Sammy
Pro, Former Vice President, Defendants,
International Brotherhood of Teamsters, Defendant-Appellant.
 No. 97-6324.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 23, 1998.
Decided March 30, 1998.
 
 William W. Taylor, III, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, DC (Michael R. Smith, Ronald H. Weich, Jonathan H. Levy, of counsel; Earl V. Brown, Jr., David L. Neigus, Office of the General Counsel, International Brotherhood of Teamsters, Washington, DC, of counsel), for Defendant-Appellant.
 Karen B. Konigsberg, Assistant United States Attorney for the Southern District of New York, New York City, (Steven M. Haber, Assistant United States Attorney, Mary Jo White, United States Attorney, of counsel) for Plaintiff-Appellee.
 Before: WINTER, Chief Judge, PARKER, Circuit Judge, and SCHWARZER,* District Judge.
 WINTER, Chief Judge:
 
 
 1
 The International Brotherhood of Teamsters ("IBT") appeals from a decision by Judge Edelstein interpreting a consent decree ("Consent Decree" or "Decree") to require the IBT to pay for an Election Officer's supervision of a rerun of the 1996 IBT elections. The IBT argues that under the terms of the Decree, the government must pay the cost of supervision if it chooses to have the rerun supervised. We agree. The Decree provides that if the government chooses to supervise the 1996 elections, of which the rerun is conceded to be a part, the government will bear the cost. Because the allegedly improper conduct that necessitated the rerun is not attributable to the IBT under the terms of the agreement, the government's argument that the IBT must pay for the rerun's supervision is unavailing.
 
 BACKGROUND
 
 2
 The instant matter involves another dispute over the meaning of the Consent Decree entered into by the IBT and the government in March 1989. See United States v. IBT ("1996 Election Rules Order "), 86 F.3d 271, 272-73 (2d Cir.1996) (collecting cases). A history of the parties' extensive litigation over the Decree is included in an earlier opinion of this court, United States v. IBT ("1991 Election Rules Order "), 931 F.2d 177, 180-82 (2d Cir.1991), familiarity with which is assumed. In brief, the Decree, which arose from the settlement of the government's civil RICO action against the IBT, instituted various reforms designed to help end the influence of organized crime within the IBT. Among the provisions of the Decree is one stating that a court-appointed Election Officer shall supervise the 1991 IBT elections at IBT expense. With regard to the 1996 elections, however, Paragraph 12(D)(ix) of the Decree states that supervision is at the government's option and that, if the government chooses to exercise that option, the consequent supervision will be at the government's expense.
 
 
 3
 In the course of administering the Consent Decree prior to the 1991 elections, the district court rejected a claim by the IBT that "supervise" was a narrow term, limited largely to passive oversight. Instead, the court adopted the government's and Election Officer's view that "supervise" was a "proactive" term that allowed the Election Officer to regulate, manage, and carry out virtually every step in the process of electing IBT international officers. United States v. IBT, 723 F.Supp. 203, 206-07 (S.D.N.Y.1989). In practice, this ruling led to the Election Officer's involvement in many routine acts such as the printing, mailing, and counting of ballots. At the time, this broad interpretation pleased the government because it maximized the Election Officer's powers and because, under the provisions of the Consent Decree, the IBT paid all the costs of supervising the 1991 elections.
 
 
 4
 With regard to the 1996 IBT elections, the government exercised its option under Paragraph 12(D)(ix) to have the elections supervised by the Election Officer. While the broad interpretation of the term "supervise" described above continued to maximize the Election Officer's powers, it also increased the financial burden on the government because the Consent Decree now required the government to pay the costs of such supervision. As a result, the government paid for many routine expenses of the 1996 elections--again, for example, the printing, mailing, and counting of ballots--in addition to expenses that were directly incurred by the Election Officer.
 
 
 5
 After the 1996 elections resulted in the reelection of General President Ronald Carey, the Election Officer found that IBT funds had been embezzled and used to support Carey's reelection campaign. The Election Officer refused to certify the results and thereafter ordered a rerun. Subsequently, three non-Teamsters--Martin Davis, Michael Ansara, and Jere Nash--pleaded guilty to various federal charges relating to the 1996 elections, including conspiracy to embezzle union funds (Ansara, Davis, and Nash) and embezzlement of union funds (Davis). The district court appointed Kenneth Conboy as an election officer with power to decide whether to disqualify Carey from participating in the rerun. Conboy concluded that Carey, along with another IBT official, Director of Government Affairs William Hamilton, had participated in the scheme to embezzle IBT funds and, accordingly, Conboy disqualified Carey from the rerun. Conboy's decision was upheld by the district court, United States v. IBT, 988 F.Supp. 759 (S.D.N.Y.1997), and is now the subject of a separate appeal pending in this court.
 
 
 6
 Also subsequent to the Election Officer's decision not to certify the election results, Congress enacted appropriations legislation prohibiting government funds from being used to pay for supervision of the rerun. The Election Officer reacted to this development by filing an application with the district court requesting that it enter an order ensuring full funding for the rerun's supervision. The Election Officer did not take a position as to who should be responsible for that funding. In response to the Election Officer's request, the district court held that although the rerun constitutes part of the 1996 elections, the funding obligation for supervision must nevertheless be borne under the Consent Decree by the IBT rather than by the government. United States v. IBT, 989 F.Supp. 468 (S.D.N.Y.1997). In the district court's view, because the IBT, through its agents Carey and Hamilton, engaged in the misconduct necessitating the rerun, the IBT is responsible for funding the rerun's supervision.
 
 DISCUSSION
 
 7
 We review de novo a district court's interpretation of a consent decree. EEOC v. Local 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers ("Local 40 "), 76 F.3d 76, 80 (2d Cir.1996). Although consent decrees are judicial orders subject to enforcement by courts, they are also agreements between parties that "should be construed basically as contracts." United States v. IBT ("IRB Rules "), 998 F.2d 1101, 1106 (2d Cir.1993) (quoting United States v. ITT Continental Baking Co., 420 U.S. 223, 236-37, 95 S.Ct. 926, 934-35, 43 L.Ed.2d 148 (1975)). In enforcing a consent decree, a court is constrained to read and apply the decree " 'within its four corners' and may not look beyond the document to satisfy one of the parties' purposes." United States v. IBT ("Wilson, Dickens & Weber "), 978 F.2d 68, 73 (2d Cir.1992) (quoting United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757-58, 29 L.Ed.2d 256 (1971)). A court is not entitled to expand or contract the agreement of the parties as set forth in the decree and must give the explicit language of the decree great weight. Local 40, 76 F.3d at 80; Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir.1985). In addition, "[a] court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals." IRB Rules, 998 F.2d at 1107. Although courts have equitable powers to enforce consent decrees, see United States v. Local 359, United Seafood Workers, 55 F.3d 64, 69 (2d Cir.1995), such powers exist only to allow courts to ensure compliance with the decrees' terms. See id.
 
 
 8
 The Consent Decree expressly addresses the issue before us. It is undisputed that the rerun is a part of the 1996 elections. Therefore, the Decree's provision that the IBT "consent[s] to the Election Officer, at Government expense, to supervise the 1996 IBT elections" governs. The Consent Decree is the result of a bargain struck by the government and the IBT in which the government agreed to settle its civil RICO suit against the IBT in exchange for the IBT's promise to implement various electoral and disciplinary reforms. As part of the bargain, the government has the right, but not the obligation, to have the 1996 IBT elections supervised by an Election Officer. If the government chooses to exercise that right, however, the Decree provides that the government must bear the costs of the supervision. Those costs may include routine election expenses because the government early-on sought and obtained a broad reading of the term "supervise."
 
 
 9
 The government concedes in its brief that "in the ordinary course it is reasonable and appropriate to construe the funding provision as requiring the Government to pay, if it elects to have the rerun supervised." The government argues, however, that the funding provision is inapplicable to the rerun because "it is not reasonable to construe the parties' intent as requiring one party to bear the costs of a rerun, even if that rerun is caused by the misconduct of the other party." According to the government, the IBT is directly responsible for the circumstances necessitating the rerun because of its "failure to achieve compliance [with the Decree] by persons in positions of relevant responsibility," United States v. Phelps Dodge Indus., Inc., 589 F.Supp. 1340, 1359 (S.D.N.Y.1984), and because it "did not have in place adequate procedures to guard against the commission of such unauthorized acts." Kozera v. Westchester-Fairfield Chapter of Nat'l Elec. Contractors Ass'n, 909 F.2d 48, 55 (2d Cir.1990). In addition, the government argues that the IBT is vicariously responsible for the alleged misdeeds of its agents, Carey and Hamilton, under principles of agency law and respondeat superior. Although notions of direct and vicarious liability seem to merge in the present factual context, we address them separately.
 
 
 10
 We reject the government's argument that the IBT is directly responsible for causing the rerun. The government has not identified any provision in the Consent Decree with which the IBT failed to comply because of Carey's and Hamilton's acts. The wrongful acts here constituted embezzlement from the IBT for the purpose of funding Carey's campaign. The IBT's status as a victim of embezzlement is simply not a violation of the Consent Decree. Furthermore, even if we assume that Carey and Hamilton did violate the Decree, the IBT is not responsible for failing to guard against such unauthorized acts. In Phelps Dodge and Kozera, organizations were held to be directly liable for the harm done to third parties by agents of the organizations. Here, however, Carey and Hamilton are alleged to have embezzled money from the IBT. Unlike the circumstances in Phelps Dodge and Kozera, Carey's and Hamilton's alleged embezzlement directly harmed the IBT itself by depleting its funds. More important, the embezzlement was not in the scope of their employment but rather furthered their personal interests in retaining power within the IBT.
 
 
 11
 For similar reasons, the IBT is not vicariously liable for the acts of Carey and Hamilton. "While an employer may be liable for even intentional and criminal acts committed by its employee, those acts must in some way further the interests of the employer, and not solely benefit the employee." FMC Corp. v. Boesky (In re Ivan Boesky Sec. Litig.), 36 F.3d 255, 265 (2d Cir.1994). See also In re American Biomaterials Corp., 954 F.2d 919, 924-25 (3d Cir.1992) ("[I]n no jurisdiction that our research has uncovered does an employee who embezzles from the corporation act in the scope of employment in doing so.").
 
 
 12
 To be sure, Carey's and Hamilton's acts ultimately caused injury to the government by imposing responsibility for costs on the government for choosing to supervise the rerun election. That injury, however, came about because of the terms of the Consent Decree interpreted as the government wished. The parties to the Consent Decree foresaw that supervision by the federal Election Officer would be costly and included explicit terms allocating those expenses. For its own reasons, the government sought and obtained an expansive interpretation of the term "supervision." Under the terms of that Decree and their earlier interpretation by the district court, the government must bear the costs it has agreed to. We express no opinion as to the liability of any other parties for the costs of supervising the present rerun or as to whether the IBT may under different circumstances be responsible for those costs.
 
 
 13
 We therefore reverse.
 
 PARKER, Circuit Judge, dissenting:
 
 14
 I cannot agree with the majority's statement that "the government has not identified any provision in the Consent Decree with which the IBT failed to comply because of Carey's and Hamilton's acts." Ante at ----. In fact, the government has pointed to such a provision, and the evidence supports a finding that the IBT failed to comply with such. I would therefore find that the district court properly exercised its broad discretion to ensure compliance with the Consent Decree in ordering the IBT to pay for the cost of the rerun election. Accordingly, I respectfully dissent.
 
 
 15
 It is undisputed that the IBT is a party to the Consent Decree and is bound by its terms. These terms include the IBT's consent to the provision allowing "the Election Officer, at Government expense, to supervise the 1996 IBT Elections." Consent Decree p 12(D)(ix). Pursuant to the Consent Decree, the IBT and its officers are further "enjoined ... from obstructing or otherwise interfering with the work of" the Election Officer. Consent Decree p 10. Further, an explicit purpose of the Consent Decree is to assure that the IBT is "maintained democratically." Consent Decree, 6th Whereas Clause.
 
 
 16
 This Court, as the majority notes, has previously interpreted the word "supervise," as used in the Consent Decree, quite broadly. See United States v. IBT ("1991 Election Rules Decision"), 931 F.2d 177, 187 (2d Cir.1991) (Winter, J.). This broad construction has previously led this Court to hold that the Consent Decree (to which the IBT agreed) authorized certain rules to be promulgated by the Election Officer governing the supervised elections. See Id. ("We find ample authority in the Consent Decree for the [Election Rules order]. The Election Officer has broad authority to 'supervise' the IBT election process.... The Election Officer thus has substantial discretion to impose election rules and procedures that ensure that the upcoming elections are free, fair and informed."); see also United States v. IBT, 723 F.Supp. 203, 207 (S.D.N.Y.1989) ("To this end, I approve the proposed actions of the Election Officer, including the right to promulgate electoral rules and procedures for the IBT nomination and election ...."), appeal dismissed, No. 89-6252 (2d Cir. Dec. 13, 1989). Obviously, if the election rules are to have any effect in ensuring free and fair elections, they must necessarily be binding upon the union.
 
 
 17
 These election rules were initially proposed by the Election Officer, and upon notice to the parties, were submitted to the district court for approval. See United States v. IBT ("1996 Election Rules Decision"), 896 F.Supp. 1349, 1353 (S.D.N.Y.1995), aff'd as modified, 86 F.3d 271 (2d Cir.1996). During this process, all parties to the Consent Decree had the opportunity to participate in the development of the rules and to comment on or object to them prior to the district court's approval of them. See Id. at 1355. Once the election rules were approved, they became enforceable "under pain of contempt." Id. at 1373. Abiding by the election rules is therefore properly viewed as a term of the Consent Decree because the parties have consented to the supervision of the election.
 
 
 18
 The 1996 election rules, which were approved by both the district court and this Court, see id., prohibit the use of IBT funds to benefit a candidate for IBT office. Specifically, the 1996 election rules provide:
 
 
 19
 No labor organization, including but not limited to the International Union ... may contribute, or shall be permitted to contribute, directly or indirectly, anything of value, where the purpose, object or foreseeable effect of the contribution is to influence, positively or negatively, the election of a candidate....
 
 
 20
 1996 Election Rules, Art. XII, § 1(b)(1). As this Court has noted:
 
 
 21
 Rules prohibiting the use of Union funds ... to support or oppose candidates for IBT office are important measures for bringing democratic control to the IBT and for ridding it of influence by criminal elements. Allowing the use of Union-controlled resources to influence IBT elections would give an advantage over their opponents to candidates supported by those who control the funds of local unions.
 
 
 22
 1996 Election Rules Decision, 86 F.3d at 274. The 1996 election rules also provide that if union funds are so used, the lack of institutional knowledge of such use by the union does not provide a defense to a finding of a violation. See Election Rules, Art. XII, § 1(b)(10) ("Ignorance by a candidate, by a union, and/or by an employer that union or employer funds or other resources were used to promote a candidacy shall not constitute a defense to an allegation of a violation of the [Election] Rules."). This is a rule of strict liability.
 
 
 23
 In applying these principles to the swap scheme involving Carey and Hamilton,[1] the Election Officer initially stated:
 
 
 24
 In order to find a violation by the IBT, the Election Officer must have evidence that the IBT's assets were contributed by the IBT with the purpose, object or foreseeable effect of influencing the campaign....
 
 
 25
 There is insufficient evidence that IBT officials knew that they were making payments and contributions that would be used for campaign purposes. However, the evidence clearly establishes that significant amounts of IBT funds were used to benefit the Carey Campaign.... For these reasons, while no violation is found against the IBT at this time, the participation of the IBT and its officers and employees in any schemes to benefit the Carey Campaign will be part of a referral for further investigation....
 
 
 26
 IBT Election Officer Decision, dated Aug. 21, 1997 ("Rerun Decision"), pp. 101-02 (emphasis added). Subsequently, following the guilty pleas and allocutions of Davis, Nash and Ansara, the Election Officer found that the evidence demonstrated that Carey and Hamilton had knowledge of, and were involved in, this scheme. IBT Election Officer Decision, dated Nov. 17, 1997 ("Disqualification Decision"), pp. 21, 36, aff'd, 988 F.Supp. 759 (S.D.N.Y.1997), appeal pending, Dkt. No. 98-6014 (2d Cir. filed Jan. 20, 1998).
 
 
 27
 Reading these two Election Officer decisions together,[2] it is clear that the IBT violated the 1996 election rules. The Election Officer first found no violation by the IBT because there was insufficient evidence to show that IBT officials were involved in the scheme, but subsequently, in a separate decision, found that the evidence showed such involvement. As laid out above, under the election rules, because IBT officials used IBT funds to benefit the Carey Campaign, the IBT violated the election rules. Due to the strict liability standard under the rules, a lack of knowledge by IBT does not change IBT's status as a violator.[3]
 
 
 28
 Moreover, Art. XII, § 1(b)(3) of the 1996 election rules provides: "No Union funds of other things of value shall be used, directly or indirectly, to promote the candidacy of any individual." 1996 Election Rules, Art. XII, § 1(b)(3). There is no question that union funds were used to promote Carey's candidacy. Once again, this appears to be a rule of strict liability that was violated by the IBT.
 
 
 29
 As noted above, the election rules are to be read into the Consent Decree. Thus, a violation of the election rules amounts to a violation of a term of the Consent Decree, specifically the term in which the IBT consented to supervision of the election. Given this violation, the district court's decision is properly viewed as remedial, rather than interpretive, in nature, and is therefore subject only to abuse of discretion review. See Juan F. v. Weicker, 37 F.3d 874, 879 (2d Cir.1994); Berger v. Heckler, 771 F.2d 1556, 1569 (2d Cir.1985). As such, the district court is afforded broad discretion to ensure compliance with consent decrees: "Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt." Berger, 771 F.2d at 1569. Further, we have noted that "a court has an affirmative duty to protect the integrity of its decree. This duty arises where the performance of one party threatens to frustrate the purpose of the decree." Id. at 1568 (citations omitted).
 
 
 30
 I therefore believe that the district court did not abuse its discretion in requiring the IBT to bear the costs of the rerun election. Requiring the IBT to bear those costs is an appropriate remedy for a violation of the Consent Decree which violation made the rerun necessary in the first place, and threatened to frustrate the purposes of the Consent Decree. Such a remedy will serve to make the government whole and further the purposes of the Consent Decree by providing supervision to ensure that 1996 IBT rerun election is fair and democratic. The government will thus receive the benefit of its bargain--assuring IBT democracy--which it has already paid for, in compliance with the Consent Decree's directive (in amounts exceeding $ 17 million), and which it would have received but for the violations of the election rules by the IBT.
 
 
 31
 Accordingly, I respectfully dissent.
 
 
 
 *
 The Honorable William W Schwarzer, of the United States District Court for the Northern District of California, sitting by designation
 
 
 [1]
 Basically, the swap scheme involved donations of IBT funds to certain organization, and subsequent donations, in lesser amounts, to the Carey campaign from affiliates of those organizations
 
 
 [2]
 The district court, and this Court, are entitled to rely upon the findings of court appointed officers. See Juan F. v. Weicker, 37 F.3d 874, 879-80 (2d Cir.1994)
 
 
 [3]
 I also note that I am unconvinced by the majority's attempt to distinguish United States v. Phelps Dodge Indus., Inc., 589 F.Supp. 1340 (S.D.N.Y.1984) on the basis that Carey's and Hamilton's action directly harmed the IBT, and that they were not acting within the scope of their employment. Ante at 408. In Phelps Dodge, the court held that the defendant:
 has a duty to ensure compliance with [provisions of a consent decree], penalties for noncompliance are imposed not as a matter of vicarious liability, nor of apparent authority, nor of respondeat superior, but instead simply for failure to achieve compliance by persons in positions of relevant responsibility.
 Id. at 1359. The court also noted that whether the employee acted for the benefit of the employer was irrelevant, "[l]iability for civil penalties, on the other hand, accrues without regard to the actor's intent; the government need only prove that the Order has in fact been violated." Id. at 1359-60 (citations omitted).