**State of NEW YORK by Eliot SPITZER, Attorney General, Plaintiff,**

v.

**SAINT FRANCIS HOSPITAL, Vassar Brothers Hospital and Mid–Hudson Health, Defendants.**

**No. 98 CIV. 0939(WCC).**

United States District Court, S.D. New York.

Oct. 28, 2003.

Eliot Spitzer, Attorney General of the State of New York (Robert L. Hubbard, Esq., Director of Litigation, Antitrust Bureau, Of Counsel), New York City, for Plaintiff.

Nixon Peabody LLP (Daniel J. Hurteau, Esq., Of Counsel), Albany, NY, for Defendant Saint Francis Hospital.

Daniels & Porco, LLP, (Michael G. Hayes, Esq., Of Counsel), Pawling, NY, for Defendants Vassar Brothers Hospital.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

The State of New York ("State"), by Attorney General Eliot Spitzer, brought a civil action pursuant to state and federal antitrust laws against defendants St. Francis Hospital ("St.Francis"), Vassar Brothers Hospital ("Vassar") and Mid–Hudson Health ("Mid–Hudson"). The State claimed that St. Francis and Vassar, through their agent Mid–Hudson, fixed the rates, terms and conditions for services provided at defendant hospitals and that defendant hospitals wrongfully divided the market for the provision of various services between them, in violation of Section One of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. GEN. BUS. LAW, ART. 22, §§ 340–47. The State sought injunctive relief, civil penalties of up to one million dollars per violation pursuant to Section 342–a of the Donnelly Act, N.Y. GEN BUS. LAW, ART. 22, attorneys' fees and costs of suit. Thereafter, defendant hospitals moved for summary judgment and the State cross-moved, seeking a determination that defendants' alleged activities were illegal per se and that defendants were not entitled to state-action immunity. In April 2000, this Court denied defendants' motion for summary judgment, and granted the State's cross motion for summary judgment. *New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F.Supp.2d 399, 402–03 (S.D.N.Y.2000) (Conner, J.).

Thereafter, in June 2000, the parties jointly moved this Court for entry of a Final Consent Judgment to constitute a full resolution of the litigation. (Davis Aff., Ex. A.) We granted the motion and entered judgment accordingly, retaining jurisdiction pursuant to Article XIII of the Final Consent Judgment, "for the purpose of enabling any of the parties . . . to apply . . . at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Consent Judgment, to modify or terminate any of its provisions, to enforce compli-

ance, or to punish violations of its provisions." In the matter presently before the Court, Vassar moves for an order construing the Final Consent Judgment, and: (1) declaring that St. Francis's cardiac payment claim is prohibited by the nullifications contained in the Final Consent Judgment; (2) ordering St. Francis to participate in the voluntary dissolution of Mid–Hudson without further claim or demand relating to the placement of cardiac surgery services at Vassar; and (3) directing the State to provide affirmative support for the Vassar cardiac catheterization laboratory application pending before the New York State Department of Health ("Department"). (Davis Aff. ¶¶ 23–24.) For the reasons set forth herein, we grant Vassar's motion to construe and conclude that: (1) St. Francis's cardiac payment claim against Vassar is precluded by the nullifications contained in the Final Consent Judgment; (2) St. Francis is required to participate in the voluntary dissolution of Mid–Hudson without further claim or demand relating to the placement of cardiac surgery services at Vassar; and (3) the State is required, upon Vassar's request, to provide written notification of this Opinion and Order to the appropriate parties at the Department.

## BACKGROUND [1]

Drafted collaboratively by the parties in response to this Court's prior Opinion and Order, the relevant Article of the Final Consent Judgment expressly nullified: (1) three agreements between defendant hospitals that had established Mid–Hudson and furthered its mission of reducing competition between them; (2) the "Trades" that had served as an allocation of services between defendant hospitals; [2] and (3) the "Fairness Formula" that had allocated revenue between defendant hospitals.[3] (Final

---

1. The facts and transactions that gave rise to the initial litigation that was resolved by the *Final Consent Judgment* at issue in the instant motion were set forth in detail in this Court's prior Opinion and Order dated April 10, 2000, with which this Court assumes familiarity. *See generally St. Francis Hosp.*, 94 F.Supp.2d at 399.

2. As described in this Court's prior Opinion and Order:

 The "trades" are an allocation of services between defendant hospitals. Marianne L. Muise, vice president of finance and administrative services for St. Francis, states that "[t]he trades were a balancing formula" pursuant to which the hospitals agreed not to compete against one another. (McCareins Decl., Ex. 18 at 155, 192–93.) The "trades" are set forth in an undated document which shows specialties divided between the two hospitals. (*Id.*, Ex. 28.) Once a hospital reached a "certain criteria level of expertise, high technology, it would be classified as a Center of Excellence." (*Id.*, Ex. 18 at 193.) Vassar's campus is the designated site for the cardiac catheterization laboratory and the cardiology center; obstetrics; the predominant site for gyne-

cology; cancer admissions dependent on high technology; fifty percent of general surgery; and the medical pediatrics unit. St. Francis is designated for selected cancer admissions not dependent upon high technology; orthopedics/neurology; MRI; mobile lithotripsy; the predominant site for ambulatory surgery and the laser center; the predominant diagnostic outpatient center; plastic surgery; fifty-percent of general surgery; an expanded emergency room, trauma II; and a guaranteed percentage of the market share of medical admissions. (*Id.*)

*St. Francis Hosp.*, 94 F.Supp.2d at 405 (alteration in original).

3. As stated in the prior Opinion and Order:

 Defendants' "Fairness Formula" is a revenue/market share-oriented model that allocates revenue between the hospitals while at the same time recognizing that there are variable costs associated with the provision of services. In addition to variable costs, the model also accounts for any special investments for a "Center of Excellence." Once gross revenue at each hospital is calculated for each applicable service, it is reduced by the variable cost assumption as

Consent J., art. VI, ¶¶ 1–3.) The Final Consent Judgment also ordered defendant hospitals to: (1) dissolve Mid–Hudson within sixty days of the Final Consent Judgment; and (2) "terminate any agreement, understanding, arrangement, contract or combination entered into with [each other] that conditions any actual price or term between the Defendant Hospital and a Third Party, including a third party payer, on the formal or informal approval, review or acquiescence of the other Defendant Hospital." (*Id.*, ¶¶ 4–5.)

In August 2000, acting pursuant to the Final Consent Judgment, defendant hospitals began to dissolve Mid–Hudson voluntarily in accordance with the process required by Article 10 of the New York State Not–for–Profit Corporations Law. (Davis Aff. ¶¶ 25–26.) Numerous transitional and financial issues arose during the voluntary dissolution process, not the least of which was whether St. Francis was entitled to compensation from Vassar because the highly lucrative cardiac services unit remained with Vassar as a result of the earlier trades.[4] (Davis Aff. ¶¶ 25–26, Murphy Aff. ¶¶ 8–9, 16–17.) Vassar, relying on its interpretation of the nullifications' language, declined to make any such payment to St. Francis.[5] (Davis Aff. ¶ 28; Murphy Aff. ¶ 24.) As a result of this dispute, the negotiations between the defendant hospitals toward the voluntary dissolution of Mid–Hudson have broken down, and Vassar, claiming that its operations have been severely prejudiced by the

well as by any depreciation for capital acquisitions, costs and advertising expenses for Centers of Excellence. The amount of net market share is compared to the base year of 1991 to determine whether any imbalance exists. Defendants agreed to ask physicians who had privileges at each hospital to redirect patients from the advantaged hospital to the disadvantaged hospital to help keep defendants' market shares roughly fixed at their 1991 levels. (Pl. Rule 56.1 Stmt., Ex. 6 at 301–02.)

*St. Francis Hosp.*, 94 F.Supp.2d at 405.

4. Prior to the antitrust litigation, it had been agreed between defendant hospitals that Vassar would host cardiac services, but St. Francis "consoled itself in the belief that it would be protected by the Trades and Fairness Formula, as the expected benefits of cardiac services would go to both hospitals, and that the license was in Mid–Hudson's name (an entity created and jointly owned by St. Francis and Vassar)." (Murphy Aff. ¶¶ 8–9.)

5. There is an underlying factual dispute between defendant hospitals about the degree to which they had contemplated these payments from Vassar to St. Francis during both the negotiation of the Final Consent Judgment and the subsequent Mid–Hudson dissolution process. St. Francis claims that this payment was contemplated during the negotiation process leading up to the Final Consent Judgment, and that Article V, ¶ 10 and the accompanying Exhibit A of the Final Consent Judgment were intended to facilitate the negotiation of this payment by Vassar. (Murphy Aff. ¶ 18; Nask Aff. ¶¶ 9–12.) Indeed, St. Francis further claims that the cardiac services payment is not mentioned explicitly in the Final Consent Judgment because of the concerns of the State, and not of Vassar. (Nask Aff. ¶¶ 10–11.)

Vassar contends that shortly after the dissolution documents were prepared in August 2000, "St. Francis refused to proceed with the voluntary dissolution of Mid–Hudson unless Vassar first agreed to make a substantial payment to St. Francis related to the cardiac surgery services located at Vassar." (Davis Aff. ¶ 27.) In response, St. Francis contends that during the negotiations that accompanied the dissolution process after the Final Consent Judgment was entered, Vassar actively discussed compensating St. Francis, and at one point Vassar had offered to pay St. Francis $2.3 million for the cardiac services, offset by certain monies owed to Vassar by St. Francis from an earlier cooperative obstetrics and gynecology program. (Murphy Aff. ¶¶ 25, 28–29.) St. Francis further claims that Vassar did not contend that these payments were precluded by the Final Consent Judgment until after the aforementioned negotiations had broken down. (*Id.*, ¶¶ 27–31; Nask Aff. ¶¶ 20–22.)

delay in the dissolution of Mid–Hudson,[6] has filed the present motion for construction of the Final Consent Judgment.[7] (Davis Aff. ¶¶ 31–32, 38–41.)

## DISCUSSION

### I. Whether the Final Consent Judgment Precludes the Cardiac Services Payment

 Vassar contends that the plain language of the Final Consent Judgment is clear and unambiguous in its preclusion of St. Francis's cardiac services payment claim against it. (Def. Vassar Mem. Supp. Mot. Constr. at 8.) St. Francis claims in response that, read in its entirety, the plain language of the Final Consent Judgment does not preclude these payments, particularly because its Exhibit A sets out a procedure for resolving financial disputes that might arise during the dissolution of

Mid–Hudson.[8] (Def. St. Francis Mem. Opp. Mot. Constr. at pts. A, B.) The State contends that the payments are not prohibited by Final Consent Judgment, so long as St. Francis is seeking compensation for its own prior investments and expenditures for services sited at Vassar, and not as compensation for the termination of the agreements that this Court has declared per se illegal in its prior Opinion and Order.[9] (Pl. Mem. Resp. Mot. Constr. at 5–6, 7.) We agree with Vassar and conclude that the relevant provisions clearly and unambiguously preclude the payment demanded by St. Francis.

A consent judgment is "an agreement of the parties entered into upon the record with the sanction and approval of the [c]ourt." *Schurr v. Austin Galleries of Ill., Inc.*, 719 F.2d 571, 574 (2d Cir. 1983). It is "a contract to end a lawsuit

6. Vassar claims that the delay in the dissolution of Mid–Hudson has delayed the Department's consideration of its certificate of need application, filed in August 2002, seeking approval for construction of a third cardiac catheterization laboratory as part of its cardiac surgical facilities. (Davis Aff. ¶¶ 54–56, 60–66.) Vassar states that normally, it would be entitled to priority in the Department's consideration of its application because of its existing facilities. (*Id.*, ¶ 59.) Vassar claims that the delay in the Department's review of its application has been prejudicial to it because the Department reviews and grants these applications in a competitive manner, and it has continued to consider other hospitals' applications for the construction of cardiac catheterization laboratories. (*Id.*, ¶¶ 67–71, 73.) St. Francis is among these other hospitals, and its application has been held up similarly by the Department. (Nask Aff. ¶¶ 26–27.)

Subsequently, the Department approved Vassar's certificate of need and construction applications with respect to the third catheterization laboratory. (Pl. Mem. Resp. Mot. Constr. at 8–9, Ex. D.) As Vassar notes, however, this approval is contingent on the submission of "acceptable documentation signifying the dissolution of Mid–Hudson health."

(*Id.*, Ex. D; Def. Vassar Reply Mem. Supp. Mot. Constr. at 9–10.)

7. In light of the deleterious consequences that Vassar claims that the delay in Mid–Hudson's dissolution has had for it; *see supra* note 6; Vassar considered filing a judicial dissolution petition in New York state court for the judicial dissolution of Mid–Hudson, but elected to proceed before this Court instead. (Davis Aff. ¶¶ 32, 37.)

8. St. Francis further claims that, if the Court should hold that the contract is ambiguous as to whether the payment is precluded, the actions of the parties in the negotiations that preceded and followed the Final Consent Judgment are convincing parol evidence that they did not contemplate the Final Consent Judgment precluding payments from Vassar to St. Francis for the cardiac services. (Def. St. Francis Mem. Opp. Mot. Constr. at pt. I.B.)

9. The State declines, however, to offer the Court any guidance as to which category St. Francis's claim belongs in, stating that "[a]t this point, it cannot answer these questions definitively." (Pl. Mem. Resp. Mot. Constr. at 7.)

in which the parties agree to the relief to be provided by the judgment and the wording to effectuate that relief." *Audiovisual Publishers, Inc. v. Cenco, Inc.,* 964 F.Supp. 861, 875 (S.D.N.Y.1997). For purposes of enforcement, a consent judgment should be construed and interpreted as a contract. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Amer., AFL–CIO,* 141 F.3d 405, 406 (2d Cir.1998). Because a consent judgment embodies compromises for the sake of settling a litigation, unlike other contracts it cannot be said to have a discernable "purpose." *See ITT,* 420 U.S. at 235–36, 95 S.Ct. 926 (citing *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971)). Rather, the scope of a consent judgment must be ascertained within its four corners. *Armour,* 402 U.S. at 682, 91 S.Ct. 1752; *Int'l Bhd.,* 141 F.3d at 406.

*SEC v. Gellas,* 1 F.Supp.2d 333, 336 (S.D.N.Y.1998) (Conner, J.).

"However, 'reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order .... Such reliance does not in any way depart from the "four corners" rule.' *ITT,* 420 U.S. at 238, 95 S.Ct. 926. Moreover, if the wording is susceptible to more than one reasonable construction, then the court may look to extrinsic evidence. *See Audiovisual Publishers,* 964 F.Supp. at 876; *United States v. Am. Soc'y of Composers, Authors and Publishers,* 782 F.Supp. 778, 788 (S.D.N.Y.1991), *aff'd,* 956 F.2d 21 (2d Cir.1992)." *Gellas,* 1 F.Supp.2d at 336.

Inasmuch as the Final Consent Judgment is construed as a contract, we begin our analysis, as with any contract, with the relevant language contained within the "four corners" of the judgment, in order to determine whether it is ambiguous.

Whether a provision of a contract is ambiguous is a matter of law for the court. *See Mellon Bank, N.A. v. United Bank Corp.,* 31 F.3d 113, 115 (2d Cir. 1994). Contract language is not ambiguous unless "it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract." *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 152 (2d Cir. 1995). In reviewing two interpretations of a contract provision, the court "need not determine which is the more likely interpretation" but rather "whether each is sufficiently reasonable to render the clause ambiguous." *Mellon Bank,* 31 F.3d at 115 (quoting *Wards Co. v. Stamford Ridgeway Assocs.,* 761 F.2d 117, 120 (2d Cir.1985)). Furthermore, in determining whether an ambiguity exists, a contract should be read as a whole. *See W.W.W. Assocs. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639 (1990).

*Nat'l Union Fire Ins. Co. v. Travelers Indem. Co.,* 210 F.Supp.2d 479, 485 (S.D.N.Y.2002) (Conner, J.). We remain, however, cognizant of the well established proposition that "[w]here, as here, the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does *not* become ambiguous simply because one of the parties later asserts that it intended a different interpretation." *New Bank of New England, N.A. v. Toronto–Dominion Bank,* 768 F.Supp. 1017, 1022 (S.D.N.Y.1991) (emphasis added).

In support of its contention that the Final Consent Judgment bars the payment demanded by St. Francis, Vassar cites four

of the nullifications within the Final Consent Judgment. (Def. Vassar Mem. Supp. Mot. Constr. at 1–3.) Paragraph 1 of the nullifications states: "Defendant Hospitals' 1991 Mid–Hudson Plan, 1995 Agreement, and 1996 Agreement are null and void and neither Defendant Hospital shall impose or seek to impose any obligation on the other Defendant Hospital or any Third Party arising from the 1991 Mid–Hudson Plan, 1995 Agreement, or the 1996 Agreement." (Final Consent J., art. VI, ¶ 1.) Paragraph 2 states: "The Fairness Formula is null and void and neither Defendant Hospital shall impose or seek to impose any obligation on the other Defendant Hospital or any Third Party arising from the Fairness Formula or any other agreement to distribute funds between Defendant Hospitals." (*Id.*, ¶ 2.) Paragraph 3 provides: "The Trades is null and void and neither Defendant Hospital shall impose or seek to impose any obligation on the other Defendant Hospital or any Third Party arising from the Trades or any agreement to site services as between Defendant Hospitals." (*Id.*, ¶ 3.) Finally, Vassar cites paragraph 4 of the nullifications, which provides: "Defendant Hospitals shall seek to dissolve Mid–Hudson within sixty (60) days of this Final Consent Judgment and, upon entry of this Final Consent Judgment, neither Defendant Hospital shall impose or seek to impose any obligation on the other Defendant Hospital or any Third Party arising from the creation or operation of Mid–Hudson. The dissolution of Mid–Hudson shall be subject to review by the New York State Public Health Council and the New York State Department of Health and Defendant Hospitals shall use best efforts to cooperate with that review." (*Id.*, ¶ 4.)

In response, St. Francis cites, as "the relevant exception," Article V, ¶ 10, in conjunction with Exhibit A to the Final Consent Judgment. (Def. St. Francis Mem. Opp. Mot. Constr. at pt. I.A.) Article V, ¶ 10 provides, in relevant part: "Nothing in this Final Consent Judgment shall prevent a payment between Defendant Hospitals as part of . . . the provisions of Exhibit A, attached hereto . . . . Nothing in this Final Consent Judgment shall prevent actions contemplated by Exhibit A or to enforce agreements to make such payments, including the Proposed Process to Resolve Breakup Financial Issues attached as Exhibit A or agreements reached as part of that process, and agreements between Defendant Hospitals concerning such payments may be reached both before and after execution of this Final Consent Agreement." (Final Consent J., art. V, ¶ 10.) Exhibit A provides: "PROPOSED PROCESS TO RESOLVE BREAKUP FINANCIAL ISSUES CONNECTED WITH MID–HUDSON LICENSED SERVICES. The parties agree that the process for resolving issues connected with the breakup of Mid–Hudson is as follows: (1) Members of the Board and Administrators of Vassar Brothers and St. Francis will work to resolve issues and determine a final settlement—45 days; (2) If item one is not successful a facilitator will be jointly hired to facilitate resolution—additional 60 days; and (3) If item two does not result in resolution of the issues either or both parties have the right to pursue legal remedies as appropriate." (*Id.*, Ex. A.)

We conclude that the plain language of the Final Consent Judgment, read as a whole, clearly and unambiguously bars the payment that St. Francis demands from Vassar. This payment would be an obligation that St. Francis seeks to impose on Vassar arising from either the Trades or the Fairness Formula; it is, therefore, barred by the plain language of the nullifications. Phrased another way, St. Francis's demand is inextricably tied to the

Trades and the Fairness Formula; but for these transactions, St. Francis would not be in a position wherein it seeks to recoup compensation for what this Court views merely as a business deal that ultimately turned out better for Vassar.

Indeed, we disagree with St. Francis's contention that Vassar's construction of the Final Consent Judgment renders Article V, ¶ 10 and Exhibit A meaningless because "all conceivable financial issues relative to the breakup of Mid–Hudson must have, *a priori*, 'arisen from' one or more of the numerated items."[10] (Def. St. Francis Mem. Opp. Mot. Constr. at pt. I.A.) To the contrary, adopting St. Francis's interpretation ultimately would result in the Article V, ¶ 10/Exhibit A exception swallowing the rule of the nullification clauses, particularly because Exhibit A merely provides a *process* for the resolution of disputes, and does *not* provide substantive governance to the parties.[11] Moreover, the nullifications cited by Vassar speak directly to the subject matter at hand, namely, obligations arising out of the Trades or the Fairness Formula; they must, therefore, take controlling precedence over the more general financial dispute provision cited by St. Francis. *See Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir.2001) ("[I]t is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'" (citation omitted)). Indeed, "[e]ven where there is no 'true conflict' between two provisions, 'specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate.'" *Id.* at 413–14 (citations omitted). Accordingly, we conclude that the payment sought by St. Francis is clearly and unambiguously barred by the language of the Final Consent Judgment. (Davis Aff. ¶ 4; Def. Vassar Mem. Supp. Mot. Constr. at 9–10.)

## II. Whether the Final Consent Judgment Requires St. Francis to Participate in the Voluntary Dissolution of Mid–Hudson

■ We next turn to Vassar's request for an order compelling St. Francis to participate in the voluntary dissolution of Mid–Hudson without further claim or demand relating to the placement of cardiac surgery services at Vassar. (Def. Vassar Mem. Supp. Mot. Constr. at 11.) St. Francis claims in response that, although the language of the Final Consent Judgment is mandatory, it nevertheless does not require the parties to follow any particular *form* of dissolution, be it voluntary or judicial. (Def. St. Francis Mem. Opp. Mot. Constr. at pt. II.)

As before, we begin with the language of the Final Consent Judgment. The relevant provision is paragraph 4 of the nullifications, which provides: "Defendant Hospitals *shall* seek to dissolve Mid–Hudson within sixty (60) days of this Final Consent

---

**10.** In light of our conclusion that the language of the Final Consent Judgment is clear and unambiguous, we need not reach St. Francis's parol evidence claims. *See, e.g.*, 46 AM. JUR. 2D *Judgments* § 219 (2003) ("Absent ambiguity in the terms of the consent judgment, the intent of the parties must be ascertained solely from the instrument itself and extrinsic evidence will not be admitted.").

**11.** Vassar's construction does not, therefore, render the procedure set forth in Exhibit A meaningless, particularly in light of financially-related provisions in the Final Consent Judgment such as Article VIII, which requires the defendant hospitals to pay to the State $583,000 in costs and fees, including attorneys' fees, or Article VII, which requires the termination of a joint contract with a physician. (Final Consent J., arts. VII–VIII.)

Judgment and, upon entry of this Final Consent Judgment, neither Defendant Hospital shall impose or seek to impose any obligation on the other Defendant Hospital or any Third Party arising from the creation or operation of Mid–Hudson. The dissolution of Mid–Hudson shall be subject to review by the New York State Public Health Council and the New York State Department of Health and Defendant Hospitals shall use best efforts to cooperate with that review." (Final Consent J., art. VI, ¶ 4 (emphasis added).) We conclude that this provision is facially ambiguous because it fails to state whether there is a required method of dissolution, and both possible proposed interpretations are reasonable.

Where ... the meaning of a word or phrase is ambiguous, the courts of New York will examine the record as a whole in an effort to interpret the agreement so as to effectuate the intent of the parties. *Kraker v. Roll,* 100 A.D.2d 424, 436, 474 N.Y.S.2d 527, 535–36 (2d Dept. 1984) .... Further, "in construing contracts, the court should reach for fair and reasonable results." *Kineon v. Bluegrass Elkhorn Coal Corp.,* 121 A.D.2d 980, 982, 505 N.Y.S.2d 624, 625 (1st Dep't 1986). Where one interpretation is broader than another, courts should not apply the broader interpretation absent a clear manifestation of intent. *See O'Brien v. Town of Mamaroneck,* 20 N.Y.2d 587, 594, 285 N.Y.S.2d 843, 848, 232 N.E.2d 844, 847 (1967); *Kraker,* 100 A.D.2d at 438, 474 N.Y.S.2d at 536. Rather, where contracts are negotiated by counsel for sophisticated commercial parties, courts should interpret ambiguous language to realize the reasonable expectations of the ordinary businessperson.

*Bank of New York v. Amoco Oil Co.,* 35 F.3d 643, 661–62 (2d Cir.1994) (construing settlement agreement).

Neither St. Francis nor Vassar provides any extrinsic evidence of the parties' intent in this respect. Guided, however, by the "reasonable expectations of the ordinary businessperson," we conclude that the Final Consent Judgment requires defendant hospitals to work towards the voluntary dissolution of Mid–Hudson. The choice between voluntary, as compared to judicial, dissolution of Mid–Hudson is analogous to a party's decision about whether to consider settlement of a dispute. Indeed, it is well established that public policy favors settlement because "[a] negotiated compromise of a dispute avoids potentially costly, time-consuming litigation and preserves scarce judicial resources; courts could not function if every dispute required a trial.... In addition, there is a societal benefit in recognizing the autonomy of parties to shape their own solution to a controversy rather than having one judicially imposed...." *In re New York County Data Entry Worker Product Liability Litigation,* 162 Misc.2d 263, 267–68, 616 N.Y.S.2d 424 (N.Y.Sup.1994) (citations omitted); *accord Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini,* 258 F.Supp.2d 254, 257 (S.D.N.Y.2003) ("When exercising its discretion [in determining the fairness of proposed class action settlement], the Court will review the proposed settlement in light of the strong judicial and public policies that favor settlements."). In accordance with this public policy, and considering the probable savings of time and money that attend voluntary, as opposed to judicial dissolution, we construe the ambiguous provision of the Final Consent Judgment to require the defendant hospitals to work towards voluntary dissolution of Mid–Hudson.

### III. *The State's Support for Vassar's Pending Cardiac Catheterization Application*

■ Finally, we turn to Vassar's request for an order, pursuant to the Final

Consent Judgment, imposing an affirmative obligation on the State to support Vassar's efforts to secure Department approval of its cardiac catheterization laboratory application; *see supra* note 6; by advising the Department that St. Francis's cardiac payment claim is barred by the nullifications, and that "Vassar's application should not be halted by the Department for reasons relating to the dissolution of Mid–Hudson or the Cardiac Payment claim." (Def. Vassar Mem. Supp. Mot. Constr. at 12–13; Def. Vassar Reply Mem. Supp. Mot. Constr. at 10.) Alternatively, Vassar requests an order directing the State to "provide the Department with instructions consistent with the Court's ruling once granted." (Def. Vassar Reply Mem. Supp. Mot. Constr. at 10.) The State contends, in response, that Vassar never notified it of Vassar's desire for support of its application to the Department, and in the alternative, that Vassar's claims against it in this respect are moot because the Department already has conditionally granted its cardiac catheterization laboratory application. (Pl. Mem. Resp. Mot. Constr. at 8–9.) This mootness claim presents a potentially determinative threshold issue. *Desiderio v. Nat'l Ass'n of Secs. Dealers, Inc.,* 191 F.3d 198, 201 (2d Cir.1999), *cert. denied,* 531 U.S. 1069, 121 S.Ct. 756, 148 L.Ed.2d 659 (2001).

The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies. *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 647 (2d Cir.1998). "This case or controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Knaust v. City of Kingston,* 157 F.3d 86, 88 (2d Cir.1998), *cert. denied,* 526 U.S. 1131, 119 S.Ct. 1805, 143 L.Ed.2d 1009 (1999). "A case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *Irish Lesbian & Gay Org.,* 143 F.3d at 647.

*Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001).

On the record before us, we conclude that the issue of State support of Vassar's application for Department approval of a third cardiac catheterization laboratory is not moot. As the State itself acknowledges, the Department's approval of Vassar's application remains conditioned on the dissolution of Mid–Hudson. (Pl. Mem. Resp. Mot. Constr. at 8 n. 9.) Inasmuch as Mid–Hudson has not yet been dissolved, and construction has not yet started on the new laboratory, an order from this Court directing the State to support Vassar's application may still afford Vassar some practical relief, thereby rendering Vassar's claim justiciable.

■ We now turn to the substance of the parties' claims, and begin, as before, with the relevant language from the Final Consent Judgment. Vassar cites Article V, ¶ 2, which provides: "Each Defendant Hospital, may seek, indeed is encouraged to seek, certificates of need from the New York Public Health Council or the Department of Health or any other regulatory prerequisites to providing hospital services. *The Attorney General's office shall support each Defendant Hospital's efforts to secure these regulatory prerequisites to providing hospital services.*" (Final Consent J., art. V, ¶ 2 (emphasis added).) In response, the State cites Article V, ¶ 11, which provides: "Nothing in this Final Consent Judgment shall prevent or restrain applicable review and decision by the New York State Department of Health, including review and decision concerning conditions or contingencies within certificates of need." (*Id.,* ¶ 11.)

We conclude that these provisions of the Final Consent Judgment are not irreconcilable. Thus, although the Final Consent Judgment does not affect the Department's discretion in conditioning approval of a certificate of need on an event such as the dissolution of Mid–Hudson, the Attorney General's office nevertheless must "support," or "actively promote the interests or cause of"[12] Vassar with respect to its application before the Department. Accordingly, the State is required, upon Vassar's request, to provide written notification of this Opinion and Order to the appropriate parties at the Department. We deny, however, Vassar's request for an order requiring the Attorney General to advise the Department that "Vassar's application should not be halted by the Department for reasons relating to the dissolution of Mid–Hudson or the Cardiac Payment claim." (Def. Vassar Reply Mem. Supp. Mot. Constr. at 10.) The Final Consent Judgment expressly preserved the discretionary role of the Department in considering the application for a certificate of need.

## CONCLUSION

For all of the foregoing reasons, we grant Vassar Brothers Hospital's motion to construe, and we conclude that the Final Consent Judgment: (1) precludes St. Francis Hospital's cardiac payment claim against Vassar Brothers Hospital; (2) requires St. Francis Hospital to participate in the voluntary dissolution of Mid–Hudson Health without further claim or demand relating to the placement of cardiac surgery services at Vassar Brothers Hospital; and (3) requires the State of New York, upon the request of Vassar Brothers Hospital, to provide written notification of this Opinion and Order to the appropriate parties at the New York State Department of Health.

SO ORDERED.

---

12. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2297.